# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued February 13, 2024      Decided October 29, 2024

No. 23-7061

ANDREW HANSON, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA AND PAMELA A. SMITH,
APPELLEES

―――――

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-02256)

―――――

*Edward M. Wenger* argued the cause for appellants. With him on the briefs were *George L. Lyon, Jr.* and *Mateo Forero-Norena.*

*Ashwin P. Phatak*, Principal Deputy Solicitor General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Thais-Lyn Trayer*, Deputy Solicitor General, and *Sonya L. Lebsack*, Assistant Attorney General.

*Mary B. McCord* was on the brief for *amicus curiae* United States Conference of Mayors in support of appellees.

*Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Jeremy M. Feigenbaum*, Solicitor General, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Robert Toone*, Chief, Government Bureau, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawai'i, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan*, Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Ellen F. Rosenblum*, Attorney General, Office of the Attorney General for the State of Oregon, *Michelle A. Henry*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, and *Robert W. Ferguson*, Attorney General, Office of the Attorney General for the State of Washington, were on the brief for *amici curiae*

Massachusetts, et al. in support of appellees. *Turner H. Smith*, Assistant Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, entered an appearance.

*Priyanka Gupta Sen* was on the brief for *amicus curiae* Everytown for Gun Safety in support of appellees.

*Douglas N. Letter*, *Timothy C. Hester*, and *Ciara Wren Malone* were on the brief for *amici curiae* Brady Center to Prevent Gun Violence, et al. in support of appellees.

Before: MILLETT and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

Dissenting opinion filed by *Circuit Judge* WALKER.

I.     Factual and Procedural History ...................................... 5

II.    Standard of Review ........................................................ 7

III.   Likelihood of Success on the Merits ............................. 7
   A.   Plain Text of the Second Amendment ........................ 8
   B.   Historical Tradition of Firearm Regulation .............. 12
      1.   Historical Analogues to the Magazine Cap .......... 14
         a.   Storage of Gunpowder ..................................... 15
         b.   Time, Place, and Manner Restrictions .............. 16
         c.   Prohibition-Era Regulations ............................ 17
         d.   Restrictions on Weapons Particularly Capable of Unprecedented Lethality ................................. 18
      2.   The Nuanced Approach to History Under *Bruen* . 25
         a.   Unprecedented Societal Concern ..................... 26
         b.   Dramatic Technological Change ...................... 28

IV.    Other Preliminary Injunction Factors .......................... 30

4

   A.    Irreparable Harm ...................................................... 32
   B.    Balance of the Equities ............................................ 36

V.    Summary and Conclusion ............................................ 40

Appendix: Historical Firearms ............................................. 41

PER CURIAM:  After the Supreme Court's landmark ruling in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the District of Columbia revised its firearms laws to cap the capacity of firearm magazines at "10 rounds of ammunition." D.C. Code § 7-2506.01(b).  Over a decade ago, applying the then-prevailing intermediate scrutiny standard of review, we held the magazine cap did not violate the right to bear arms secured by the Second Amendment to the Constitution of the United States, which provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  *See Heller v. District of Columbia* (*Heller II*)*,* 670 F.3d 1244, 1264 (D.C. Cir. 2011).  Since then, the Supreme Court has rejected "means-end scrutiny in the Second Amendment context," in favor of asking whether a challenged restriction is consistent with "the Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19, 24 (2022).

Seeing a new opening, the Appellants have charged once more unto the breach.  They argue the District's magazine cap is unconstitutional under the test set forth in *Bruen* and moved the district court for a preliminary injunction to prohibit enforcement of the magazine cap.  The district court denied the motion.  Because the Appellants have failed to make the "clear showing" required for a preliminary injunction on this early and undeveloped record, *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008), we affirm the denial of their motion.

## I. Factual and Procedural History

After its "prohibition on the possession of usable handguns in the home" was held to violate the Second Amendment in *Heller*, 554 U.S. at 573, 635, the District of Columbia enacted the Firearms Registration Amendment Act of 2008, D.C. Law 17-372. The Act makes it a felony to possess a magazine capable of holding more than 10 rounds. Appellants wish to possess magazines containing up to 17 bullets, which for efficiency's sake we will refer to as an extra-large capacity magazine (ELCM) to distinguish it from a permitted large-capacity ten-round magazine.[1]

Each of the appellants, Andrew Hanson, Tyler Yzaguirre, Nathan Chaney, and Eric Klun, keeps one or more firearm magazines capable of holding more than ten rounds of ammunition outside the District of Columbia and each alleges he would use his magazines in the District for lawful purposes, including self-defense, were the magazine cap imposed by the Act not in effect. One appellant, Tyler Yzaguirre, attempted to

---

[1] In full, D.C. Code § 7-2506.01(b)-(c), provides:

> No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm.

> For the purposes of this subsection, the term 'large capacity ammunition feeding device' means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term 'large capacity ammunition feeding device' shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

register a firearm with a 12-round magazine in the District, but the Metropolitan Police Department denied his application because of the magazine cap.

On August 1, 2022 — a little more than a month after *Bruen* had been decided — the four appellants (hereinafter Hanson) sued the District and the Chief of the D.C. Metropolitan Police Department, seeking a declaratory judgment that the magazine cap violates the Second Amendment. Hanson also moved for preliminary and permanent injunctions preventing the District and the MPD from enforcing the magazine cap. The district court denied Hanson's motion for a preliminary injunction. *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 3 (D.D.C. 2023).

Because *Bruen* had "rejected how the Courts of Appeals interpreted and applied *Heller*," the district court undertook a "renewed analysis under the framework *Bruen* provides." *Id.* at 5. As applied to Hanson's suit, the court distilled the *Bruen* test into two questions: First, "whether the Second Amendment covers [ELCM] possession"; and second, if so, "whether the District's [magazine cap] is relevantly similar to an historical analogue" in the regulation of firearms. *Id.* at 8. The court then subdivided the first question into two further questions: "Whether ELCMs are 'arms' within the meaning of the Second Amendment," and "whether ELCMs are typically possessed by law-abiding citizens for lawful purposes." *Id.* at 8–9 (cleaned up).

The district court held ELCMs are "arms" within the meaning of the Second Amendment and possession of an ELCM is not within the scope of the Second Amendment right. In the alternative, the court held the District's magazine cap would be "constitutional for the independent reason that the District has shown that it is consistent with this country's his-

torical tradition of firearm regulation." *Id.* at 16. The court reasoned the District's justification for the magazine cap — "mitigating the carnage of mass shootings in this country" — matched that for Prohibition-era "laws restricting possession of high-capacity weapons" because both aimed to reduce violence, and each had a similarly modest burden on the Second Amendment right to bear arms. *Id.* at 22 (cleaned up). Accordingly, the court concluded Hanson had not shown a likelihood of success on the merits and the district court denied his motion for a preliminary injunction. Hanson timely appealed. We now affirm the order of the district court.

## II. Standard of Review

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. To get a preliminary injunction the movant must show: (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) issuing "an injunction is in the public interest." *Id.* at 20. We review the district court's decision whether "to grant the Plaintiffs' request for a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error." *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## III. Likelihood of Success on the Merits

To assess the merits of Hanson's request for a preliminary injunction,[2] we must determine whether the District's maga-

---

[2] Because the appellants conceded at oral argument that they had not made the requisite showing for a facial challenge to the District's

zine cap allowing ten but not seventeen rounds likely violates Hanson's Second Amendment rights. *Bruen* established a two-step test for making that determination. First, we consider whether "the Second Amendment's plain text covers" possession of an ELCM. *Bruen*, 597 U.S. at 17. If it does, then we must determine whether the magazine cap is "consistent with this Nation's historical tradition of firearm regulation" and therefore constitutional. *Id.* The plaintiff bears the burden of proof at the first step, whereas the Government bears the burden of proof at the second step. *See id.* at 24; *see also Bianchi v. Brown*, No. 21-1255, 111 F.4th 438, 445–46 (4th Cir. 2024).

## A. Plain Text of the Second Amendment

Under governing precedent, *Bruen* step one encompasses two more precise questions: Do ELCMs "constitute bearable arms," *Heller*, 554 U.S. at 582, and, if so, are ELCMs "in 'common use'" for a lawful purpose, such as self-defense?[3] *Bruen*,

---

magazine cap, *see* Oral Arg. Tr. at 9–14, we address their challenge only as-applied and only to the type of weapons equipped with an ELCM that appellants actually own and want to register in the District, namely, handgun magazines holding between 12 and 17 rounds. *See id.* at 11:20–12:22 (counsel for Hanson explaining that the largest magazine that Hanson "possess[es]" and "want[s] to carry in the District" holds 17 bullets).

[3] "There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two." *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1198 (7th Cir. 2023) (assuming common use is part of step two); *see Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023) (resolving common use at step two), *reh'g en banc granted, opinion vacated*, 93 F.4th 1150 (9th Cir. 2024); *United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (resolving common use at

597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). On the current record, we think the answer to both questions is likely, as Hanson maintains, to be in the affirmative.

As to the first question, Hanson is likely to succeed in showing that ELCMs are "Arms" within the meaning of the Second Amendment. "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring). A magazine is necessary to make meaningful an individual's right to carry a handgun for self-defense. To hold otherwise would allow the government to sidestep the Second Amendment with a regulation prohibiting possession at the component level, "such as a firing pin." *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *rev'd en banc*, 849 F.3d 114 (2017). We therefore agree with Hanson and the district court that ELCMs very likely are "Arms" within the meaning of the plain text of the Second Amendment.

Next, Hanson is likely to succeed in showing that ELCMs are "in common use" for self-defense, *see Heller*, 554 U.S. at 627, a deceptively simple question. To start, it demands we answer the antecedent question: What is the relevant

---

step one), *rev'd*, 602 U.S. ---, 144 S. Ct. 1889 (2024). We assume, without deciding, this issue falls under *Bruen* step one because the *Bruen* Court determined that handguns are in common use before conducting its historical analysis. *See* 597 U.S. at 32 ("Nor does any party dispute that handguns are weapons in common use today for self-defense. We therefore turn to whether the plain text of the Second Amendment protects [the petitioners'] proposed course of conduct — carrying handguns publicly for self-defense." (cleaned up)); *see also Heller II,* 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) ("In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use").

geographic area, the District of Columbia, the District-Maryland-Virginia Region, or the entire United States? We think the relevant area is the United States because the source of the right is the Constitution of the United States. It would be anomalous for the protection offered by the Second Amendment to vary from one state or place to another based upon the local popularity of a particular firearm.

What, then, does "common use" mean? We agree with the District that the answer is not to be found solely by looking to the number of a certain weapon in private hands. *Accord Bianchi*, 111 F.4th at 460 ("the Court's choice of the phrase common *use* instead of common *possession* suggests that only instances of 'active employment' of the weapon should count"). After all, there are more than 700,000 machine guns registered with the federal government, Bureau of Alcohol, Tobacco, Firearms, and Explosives, *Firearms Commerce in the United States: Annual Statistical Update 2021*, at 16 (2021), and only "approximately 200,000" stun guns owned by civilians. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) (cleaned up). Yet possession of a stun gun is protected by the Second Amendment, *id.* at 412, whereas possession of a machine gun has generally been banned, *see* 18 U.S.C. § 922(o).

The district court erred, however, in reasoning (as the District now argues) that ELCMs are outside the scope of the Second Amendment because they are most useful in military service. *Heller* contrasted weapons "in common use at the time" of the Founding with "dangerous and unusual weapons," which are "most useful in military service." 554 U.S. at 627 (cleaned up). The latter type of weapon "may be banned" not because of its military use but because of the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.*

The Supreme Court in *Heller* did not hold, however, that Second Amendment protection does not extend to weapons that are "most useful" in the military context. Rather, the Court acknowledged that the Second Amendment protects those weapons that are "in common use at the time," but not "dangerous and unusual weapons." That means that some "weapons that are most useful in military service" do not receive Second Amendment protection. *Heller*, 554 U.S. at 627. The Court conceded this differential treatment may mean that "modern developments have limited the degree of fit between the [Second Amendment's] prefatory clause and the protected right," but was untroubled by that outcome, reasoning that diminished fit could not "change [its] interpretation of the right." *Id.* at 627–628. In other words, the Court was not saying "there is no Second Amendment protection for weapons that are 'most useful in military service.'" Br. of Appellee 23. It was explaining that some "sophisticated" and "highly unusual" military weapons, *Heller*, 554 U.S. at 627, may not receive protection notwithstanding the Second Amendment predicate regarding the necessity of a "well-regulated Militia," U.S. Const. amend. II.

The District argues ELCMs are not in common use for self-defense because they are rarely used to fire more than a couple rounds in self-defense. Hanson replies that one need not fire every bullet in an ELCM in order to use it. Because ELCMs are in sufficiently wide circulation and given the disputed facts in the record about the role of ELCMs for self-defense, we will presume for present purposes that ELCMs can be used for self-defense. Accordingly, because Hanson has shown it is likely that ELCMs are "arms" and are in common use for self-defense today, it appears on this record that "the Second Amendment's plain text covers" and therefore

presumptively protects the possession of ELCMs. *See Bruen*, 597 U.S. at 17.

Hanson would have us stop here, as would our dissenting colleague, arguing that, under *Bruen*, to find an arm is in common use renders any restriction of that arm unconstitutional. As the District points out, however, *Bruen* itself precludes this argument. Although no party there disputed that "handguns are weapons in common use today for self-defense," *id.* at 32 (cleaned up), the bulk of what follows in the Court's opinion is an extended analysis of the Government's proposed historical analogues, hardly an *obiter dictum*, *see id.* part III, at 31–70.[4] We therefore conclude that, if an arm is "in common use for self-defense," then it falls to the Government, at the second step of the *Bruen* analysis, to show its restriction on the right to keep and bear arms is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## B. Historical Tradition of Firearm Regulation

Is the District's magazine cap "relevantly similar" to a tradition of regulating firearms? *Id.* at 29 (quoting C. Sunstein, *On Analogical Reasoning*, 106 HARV. L. REV. 741, 773 (1993)). Although the Supreme Court has not "provided an

---

[4] Indeed, *Bruen* itself explains that, even where an individual's conduct is "presumptively protec[ed]" because the "Second Amendment's plain text covers" it, the government can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Our dissenting colleague says *Bruen*'s historical analysis is *dicta*; it is not, but even if it were, under this court's practice, "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *See United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006).

exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, . . . *Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* (emphases added) (cleaned up). As the Court has explained,

> analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles an historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted. On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

*Bruen*, 597 U.S. at 30 (cleaned up); *see also Rahimi*, 144 S. Ct. at 1903 (emphasizing the error of requiring a "twin" instead of an "analogue").

Even with this guidance from *Bruen*, there is considerable uncertainty as to the degree of generality at which a court might properly find a relevantly similar historical analogue. At the pinnacle of abstraction, an historical analogue could be representative of "an unbroken tradition of regulating weapons to [protect communities]." *Bevis*, 85 F.4th at 1200. Conversely, one could read the history to find "no American tradition of limiting ammunition capacity." *Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1214 (S.D. Cal. 2023). We think these levels of generality and specificity exemplify, respectively, just the "regulatory blank check" and the "regulatory straightjacket"

against which *Bruen* warns. 597 U.S. at 30; *see id.* (at a high enough level of generality, "everything is similar in infinite ways to everything else" (cleaned up)). We think the appropriate level of generalization is one that aligns the regulation in question with the "how" and "why" of the historical analogue. *Id.*; *see also Rahimi*, 144 S. Ct. at 1898 ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition").

### 1. Historical Analogues to the Magazine Cap

With this understanding in mind, we turn now to whether, on this preliminary record, the District has identified a "relevantly similar" historical analogue for its magazine cap. *Bruen*, 597 U.S. at 8. To do so, the District must identify an historical tradition of regulation that burdens the right to armed self-defense in a manner similar to the burden imposed by the magazine cap (the "how") and does so for a similar reason (the "why"). As explained in greater detail below, we apply the "nuanced approach" under *Bruen* to this inquiry.

Here, our inquiry turns upon whether the District can identify an historical regulation that restricts possession of an arm based on a justification similar to that for the magazine cap, namely, to respond to "the growing use of [ELCMs] to facilitate crime and, specifically, to perpetrate mass shootings." Br. of Appellee 46.

The District and the *amici* States proffer several candidates for historical analogues of the magazine cap: laws regulating the storage of gunpowder and ammunition; time, place, and manner restrictions on when arms may be carried or firearms discharged; Prohibition-era regulations of removable magazines and their capacity; and restrictions on dangerous and un-

usual weapons, including weapons considered particularly dangerous or susceptible to unprecedented lethality.

### a. Storage of Gunpowder

The District and the *amici* States advance various restrictions on the storage of gunpowder in the Founding era as a purportedly relevant historical tradition. A modern detachable magazine is similar to a colonial or Founding-era cache of gunpowder only insofar as it acts as a limit on the firepower available to a single household. Those regulations are not "relevantly similar" because they were purely fire prevention measures that affected firearm capacity only incidentally, if at all.[5] The suggestion that they limited the Second Amendment right to keep and bear arms is silly.

---

[5] "As Massachusetts's 1780 gunpowder statute put it, its goal was to 'deter[] the Inhabitants thereof from keeping certain Quantities of Powder in Houses and Ware-Houses, &c. to the great Inconvenience, Discouragement and Danger of Persons assisting in Time of Fire.'" Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 512 (2004) (quoting ch. V, 1780 Mass. Acts 326); *see also, e.g.*, Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (requiring gunpowder in excess of the legal limit to be transported "in a waggon [sic] or carriage, closely covered with leather or canvas, and without iron on any part thereof, to be first approbated by the Firewards of said town"); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (gunpowder in a home must be stored "into four stone jugs or tin cannisters, which shall not contain more than seven pounds each"); § XLII, 1781-1782 Pa. Laws 41 (gunpowder "in any house, shop, cellar, store or other place within the said borough" must be kept "in the highest story of the house . . . unless it be at least fifty yards from any dwelling house").

### b. Time, Place, and Manner Restrictions

We also agree with Hanson that the various time, place, and manner restrictions identified by the District and the *amici* States fail to identify a "relevantly similar" analogue. They entail neither a justification nor a burden commensurate with those of the magazine cap.

Take trap or spring guns: The District argues the tradition of banning the setting of guns as a trap indicates a tradition of regulating "unacceptable levels [of] risk of harm to innocent bystanders." This analogy is too generalized and "comes too close to the means/end scrutiny that *Bruen* rejected." *Bevis*, 85 F.4th at 1200. In any event, the burden imposed by trap guns does not align with the burden imposed by the District's magazine cap. "The liability for spring guns and mantraps arises from the fact that the defendant . . . expected the trespasser and prepared an injury that is no more justified than if he had held the gun and fired it." *United Zinc & Chem. Co. v. Britt*, 258 U.S. 268, 275 (1922). In other words, restrictions on setting trap guns are justified because they target tortious activity that lies outside the realm of lawful self-defense.

Nor do prohibitions on concealed carry constitute a "relevantly similar" tradition; they lack a justification like the one animating the District's magazine cap. A prohibition on carrying a concealed weapon does nothing to limit the lethality of the weapon.

Laws that prohibit discharging a firearm within a city or after dark fare no better. *See, e.g.*, Ga. Code § 16-11-103 (2022) (prohibiting the discharge of firearms within 50 yards of a public highway). Unlike the burden the magazine cap imposes upon the right to bear arms, modest though it is, we doubt city and nighttime prohibitions burden the right to armed

self-defense at all; self-defense surely would be a complete defense to a charge under those statutes. Indeed, the purpose of these laws is akin to a prohibition on breach of the peace. *See, e.g.*, *Commonwealth v. Wing*, 26 Mass. 1, 3–4 (1829) (noting "the discharging of guns unnecessarily . . . is an offense against the public peace and security" (cleaned up)). Delaware's colonial-era prohibition on firing guns in urban areas, for example, had an exception for "days of public rejoicing." Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 163 (2007).

For these reasons, on the abbreviated record before us, we cannot say the District has carried its burden of demonstrating that time, place, and manner restrictions on the use of firearms are "relevantly similar" historical analogues to the District's magazine cap.

### c. Prohibition-Era Regulations

The district court held the magazine cap was consistent with an historical tradition of regulating magazine capacity based upon Prohibition-era bans and regulations. 671 F. Supp. 3d at 21-25. The comparison is somewhat helpful in documenting a history of limiting magazine capacity, at least when combined with rapid-firing capabilities. The district court identified bans "adopted by nearly half of all states." *Id.* at 21. Some of those states also limited magazine capacity to even fewer than 10 rounds — including two that limited capacity to a single round. *See, e.g.*, 1927 Mass. Acts 413, 413–14. But, keeping in mind the preliminary nature of this decision, those regulations alone may not suffice as a relevant analogue. Many of those laws did not regulate magazine capacity itself; rather, they addressed the combination of ELCMs and automatic fir-

ing — effectively, and often explicitly, directed at machine guns.[6]

This is to be expected, as those laws were enacted largely in response to the then-novel Thompson submachine gun invented in 1918. The regulation of machine guns through restrictions on capacity and automatic firing together targets a combination that renders a weapon significantly more lethal than a weapon equipped with an ELCM alone.

### d. Restrictions on Weapons Particularly Capable of Unprecedented Lethality

Finally, the District and its *amici* argue that historical restrictions on particularly dangerous weapons and on the related category of weapons particularly capable of unprecedented lethality constitute a relevantly similar tradition. Those laws are commensurate with the District's justification of its magazine cap to counter "the growing use of [ELCMs] to facilitate crime and, specifically, to perpetrate mass shootings." Therefore, on the limited record before us, we agree with the District that it has identified a relevant historical analogue and Hanson is not likely to succeed on the merits of his claim.

---

[6] *See, e.g.*, 1933 Cal. Stat. 1169 §§ 2–3 ("[E]very person . . . who within the State of California sells, offers for sale, possesses or knowingly transports any . . . machine gun . . . is guilty of a public offense," defining machine gun as "all firearms known as machine rifles, machine guns, or submachine guns *capable of discharging automatically and continuously loaded ammunition* . . . automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device *having a capacity greater than ten cartridges*" (emphases added)); 1932 La. Acts 337-38 § 1 (defining machine gun in part as being "capable of automatically discharging more than eight cartridges successively without reloading"); 1934 S.C. Acts 1288 § 1 (same).

The District advances as an example the history of restrictions on Bowie knives or similar blades, and to a lesser extent pocket pistols. Together with the *amici* States, the District recounts that, in response to rising murder rates and an outpouring of public concern, "nearly every state in the Union restricted Bowie (or similar long-bladed) knives in some manner, whether by outlawing their possession, carry, sale, enhancing criminal penalties, or taxing their ownership." Br. of Appellee 38.

Most of those laws merely list Bowie knives by name in the course of prohibiting the concealed carrying of dangerous weapons generally, and therefore are not indicative of a "relevantly similar" tradition. *See, e.g.*, Acts of the General Assembly of Virginia, Passed at the Session of 1838, ch. 101, at 76 ("It is against the law to habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind . . . hidden or concealed from common observation"). A handful, however, did ban the carrying, rather than only the concealment, of Bowie knives with no or narrow exceptions. *See* 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, ch. xcvi, § 1 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor"); 1871 Tex. Laws 25 § 1("[A]ny person carrying on or about his person, saddle, or in his saddle bags, any . . . bowie-knife . . . unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing . . . misdemeanor"); 1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, §§ 1–2 ("If any person . . .

shall carry on or about his person . . . any bowie knife . . . he shall . . . forfeit to the County in which his is convicted, the weapon or weapons so carried," but providing a limited exception for self-defense from an "imminent and threatening" danger).

Contemporaneous court decisions also upheld laws targeting Bowie knives against challenges based upon the Second Amendment or a state equivalent. In *Aymette v. State*, 21 Tenn. 154, 158 (1840), for example, the Supreme Court of Tennessee concluded:

> They need not, for such a purpose, the use of those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin. These weapons . . . could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution.

As the Supreme Court of Texas put it in *Cockrum v. State*, 24 Tex. 394, 402–03 (1859):

> The bowie-knife differs from [guns or swords] in its device and design; it is the instrument of almost certain death. He who carries such a weapon, for lawful defense, as he may, makes himself more dangerous to the rights of others, considering the frailties of human nature, than if he carried a less dangerous weapon. Now, is the legislature powerless to protect the rights of others thus the more endangered, by superinducing caution against yielding to such frailties? May the state not say, through its law, to the citizen, "this right which you exercise, is very liable to be dangerous to the rights of others, you must school your mind to forbear the abuse of your right, by yielding to sudden passion; to

secure this necessary schooling of your mind, an increased penalty must be affixed to the abuse of this right, so dangerous to others.

We emphasize that our identification of a relevant historical tradition is based upon the regulation of weapons that are particularly capable of unprecedented lethality and not, as the dissent would have it, upon the regulation of Bowie knives specifically. Nor is our conclusion based upon statutes the dissent characterizes as "not only too little [but also] too late." Dissent at 46.[7]

---

[7] The dissent states that "the original meaning that controls [the District's magazine cap] is undoubtedly the original meaning [of the Second Amendment] in 1791," rather than its meaning in 1868, taking no position on whether the same is true for state laws. Dissent at 46 n.203. We see three reasons, however, to believe analogues after 1791 are still relevant. First, the limitations on the Second Amendment listed in *Heller* (involving a D.C. regulation) were based on examples that occurred throughout the 19th century. *See Heller*, 554 U.S. at 626-627. Second, the Supreme Court has relied on early 19th-century (and still earlier) history to overturn state laws that implicate the Second Amendment even though the Second Amendment had not yet been incorporated through the Due Process Clause, noting that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen,* 597 U.S. at 38; *see also, e.g.*, *Rahimi*, 144 S. Ct. at 1899–902; *Bruen*, 597 U.S. at 33–59; *id.* at 38. Third, the Supreme Court has similarly emphasized that our inquiry is "not meant to suggest a law trapped in amber" and that "the Second Amendment permits more than just those regulations identical to the ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897–98. On the limited record before us, we believe that this evidence demonstrates a relevant historical tradition, as required by *Bruen* and *Rahimi*.

The broader regulation of weapons that are particularly capable of unprecedented lethality includes other prominent examples, such as the ban on sawed-off shotguns held constitutional by the Supreme Court in *Miller* and implicitly approved in *Heller*. *See* 554 U.S. at 627; *see also Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024) (The "Congress began regulating sawed-off shotguns in 1934, after they became popular with the mass shooters of their day — notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." (quotations omitted)). The examples above regarding Prohibition-era bans on machine guns, although insufficient to support a tradition of regulating magazines in and of themselves, fit nicely into the tradition of regulating weapons particularly capable of unprecedented lethality, as then-Attorney General Homer Cummings testified in 1934 dur-

---

Finally, the dissent states that "the Supreme Court's subsequent cases "confirm that 'the relative dangerousness of a weapon is *irrelevant* when the weapon belongs to a class of arms commonly used for lawful purposes.'" Dissent at 43 (quoting *Caetano*, 577 U.S. at 418 (Alito, J., concurring) (emphasis added)). This statement of a single justice is obviously not controlling. We also think there is merit in the District's argument that *Heller*'s reference to "dangerous and unusual weapons," 554 U.S. at 627 means "uncommonly dangerous" weapons. All arms are self-evidently "dangerous"; in this context, therefore, "dangerous" must mean something other than its standard definition or the word would do no work delineating the category. From the canonical example in the case law — the sawed-off shotguns at issue in *United States v. Miller*, 307 U.S. 174 (1939) — we can infer that dangerous in the phrase "dangerous and unusual" means "uncommonly dangerous." *See* Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016) (explaining a "hendiadys," a figure of speech involving "two terms, separated by a conjunction, [that] are melded together to form a single complex expression").

ing hearings regarding the bill that became the National Firearms Act:

> There are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.

National Firearms Act: Hearing(s) on H.R. 9066 Before the Comm. on Ways and Means, 73rd Cong. 45 (1934) (cleaned up); *accord Andrews v. State*, 50 Tenn. 165, 189 (1871) ("The law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully proscribed by this statute. The object being to banish these weapons from the community by an absolute prohibition for the prevention of crime, no man's particular safety, if such case could exist, ought to be allowed to defeat this end."); *State v. Reid*, 1 Ala. 612, 617 (1840) ("[A] law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution."); *see also Staples v. United States*, 511 U.S. 600, 611–12 (1994) ("[W]e might surely classify certain categories of guns — no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation — as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades."); *Ocean State Tactical*, 95 F.4th at 49 ("[O]ur nation's historical tradition recognizes the need to protect against the greater dangers posed by some

weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation").

Although these laws may target different crimes than does the magazine cap, they share the same basic purpose:  To inhibit then unprecedentedly lethal criminal activity by restricting or banning weapons that are particularly susceptible to, and were widely used for, multiple homicides and mass injuries.  Because many of the preceding examples are also outright bans on an entire class of weapons, they impose a burden on the right to armed self-defense comparable to (if nor greater than) the burden imposed by the District's magazine cap.[8]

To summarize, we hold that, at this interlocutory juncture, the District has met its burden to show its magazine cap is "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 24.  Again, "the [magazine cap] must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical

---

[8] The dissent argues that the District's law is different from permissible regulations because it is a "ban."  Dissent at, *e.g.*, 1 n.4, 31, 36-37, 45.  But the dissent acknowledges that the only merits question on this preliminary motion is whether the District erred in capping magazine capacity at 10 rounds rather than 17.  Dissent at 36 n.169.  Treating every line-drawing regulation, including in areas where appellants do not even dispute that a line can constitutionally be drawn at some point, gilds the lily, rather than undertakes a nuanced analysis.  In any event, we view the dissent's distinction between an "outright ban" and a "regulation" of arms to be of dubious utility.  One could, for example, easily reframe the law at issue in *Rahimi* — which "prohibit[ed]" individuals shown to be a credible threat to the physical safety of an intimate partner from possessing a firearm, *Rahimi*, 144 S. Ct. at 1894 — as an outright ban on the possession of firearms by this class of individuals.

twin." *Rahimi*, 144 S. Ct. at 1898 (cleaned up). On a more developed record, evidence disputing the linkage between ELCMs and mass shootings may render inapposite the tradition of banning weapons capable of unprecedented lethality. On the present record, however, we think the District's magazine cap sufficiently parallels a relevantly similar historical analogue to foreclose a finding that appellants are likely to succeed on the merits.

### 2. The Nuanced Approach to History Under *Bruen*

Nevertheless, Hanson claims no historical tradition, including this one, can be relevant because weapons capable of holding or shooting more than ten rounds without reloading have existed since the Founding (true) and there is no historical tradition either of prohibiting them or of regulating the number of rounds a gun could hold (true). Therefore, he argues, the District's magazine cap is unconstitutional. We agree there is no narrowly described tradition of banning weapons capable of holding or shooting more than ten rounds without reloading or, more generally, of regulating the number of rounds a gun may hold. The lack of such a tradition is to be expected, however, because firearms did not have the capacity to occasion a societal concern with mass shootings or other widespread homicidal criminality until dramatic technological changes vastly increased their capacity and the rapidity of firing; there simply is no relevantly similar historical analogue to a modern, semiautomatic handgun equipped with an ELCM. *Accord Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015) ("Most guns available [in 1791] could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semiautomatic guns and large-capacity magazines are more recent developments").

Again, *Rahimi* makes clear that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." 144 S. Ct. at 1897–98; *see also id.* at *30 (Barrett, J., concurring) (cautioning against "assum[ing] that founding-era legislatures maximally exercised their power to regulate"). Moreover, as *Bruen* explained, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. Because these criteria are in the disjunctive, the government may demonstrate a constitutionally adequate historical analogue for a regulation or ban of an arm implicating either criterion. We agree with the District that ELCMs implicate both.

### a.   Unprecedented Societal Concern

Large capacity magazines have given rise to an unprecedented societal concern: mass shootings. As the First Circuit has observed, there is "no direct precedent for the contemporary and growing societal concern that [ELCMs] have become the preferred tool for murderous individuals intent on killing as many people as possible, as quickly as possible." *Ocean State Tactical* 95 F.4th at 44. This comes as no surprise, because mass shootings themselves are a relatively recent phenomenon: "The first known mass shooting resulting in ten or more deaths did not occur in this country until 1949." *Id.* (cleaned up).

Mass shootings have become ever more common since then.[9] A Congressional Research Service report notes the

---

[9] "The definition of mass shooting varies by source." Office of the U.S. Surgeon General, The U.S. Surgeon General's Advisory on Firearm Violence: A Public Health Crisis in America 11 (2024). The Surgeon General's Advisory defines a mass shooting as "four or more shot or killed, not including the shooter," which it borrows

steady increase in the frequency of mass shootings, from an average of 1.1 per year during the 1970s, to an average of 4.5 per year from 2010 through 2013, Krouse & Richardson, above, at 14, and "more than 600 . . . each year between 2020 and 2023," according to data published by Gun Violence Archive and cited in the Surgeon General's Advisory, above, at 11. "Despite accounting for a relatively small number of firearm deaths, mass shooting incidents cause outsized collective trauma on society and have a strong negative effect on the public's perception of safety." *Id.* "Mass shootings that involve a firearm with a large-capacity magazine result in significantly more injuries and deaths than shootings that do not involve such magazines." *Id.* at 30 (citing Koper, 19 Crim. & Pub. Pol'y at 152–53). There can be little doubt that mass shootings are an unprecedented societal concern.

---

from the Gun Violence Archive. *Id.* The Congressional Research Service defines it as "a multiple homicide incident in which four or more victims are murdered with firearms — not including the offender(s) — within one event, and in one or more locations relatively near one another." William J. Krouse & Daniel J. Richardson, Congressional Research Service, Mass Murder with Firearms: Incidents and Victims, 1999–2013, at 2 (2015). Another study similarly defines mass shootings as "incidents in which at least four persons were killed, not including the shooter if applicable and irrespective of the number of additional victims shot but not killed." Christopher S. Koper, *Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high-capacity semiautomatic firearms*, 19 Crim. & Pub. Pol'y 147, 150 (2020). The Congress, meanwhile, has defined "mass killing" to mean "3 or more killings in a single incident." 28 U.S.C. § 530C(b)(1)(M)(i)(I).

### b. Dramatic Technological Change

A nuanced approach is also appropriate for the analysis of historical analogues to the District's magazine cap because large-capacity, detachable magazines for semiautomatic handguns are a relatively modern invention. They are different in form and in kind from arms in common use during the Founding and Reconstruction eras, the relevant periods for assessing the original understanding of the Second and the Fourteenth Amendments, respectively.[10]

Compared to the historical analogues Hanson offers, modern firearms equipped with ELCMs do not have the propensity to jam or misfire that plagued many historical weapons. ELCMs also have significantly larger capacities and can fire multiple rounds in a shorter time. Indeed, a handgun with an ELCM can fire more than 10 rounds in a few seconds. The Glock 17 handgun, for example, can fire 30 rounds in five seconds. Add to that the ease with which one detachable magazine can be swapped for another, and a handgun with an ELCM can fire scores of shots in a matter of seconds.

There were no remotely comparable arms in common use even when the Fourteenth Amendment was ratified. As a result, modern firearms equipped with ELCMs have enabled

---

[10] *See Bruen*, 597 U.S. at 82 (Barrett, J., concurring) (there is an "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 or when the Bill of Rights was ratified in 1791" (cleaned up)). Because the choice would not alter our conclusion, we take no position regarding whether the relevant period for analysis is 1791 or 1868. *See, e.g.*, *Rahimi*, 144 S. Ct. at 1898 n.1 ("under the circumstances, resolving the dispute [is] unnecessary to decide the case").

mass shootings to a degree impossible with Founding or Reconstruction era weapons.

To bolster his argument to the contrary, Hanson offers several pre-Fourteenth Amendment examples of weapons capable of holding or shooting more than ten rounds without reloading, s*ee* Appendix: Historical Firearms, some of which are irrelevant and none of which is persuasive. Most of his examples were never in common use — indeed, some were no more than one-offs or prototypes — and therefore have no bearing on the scope of the Second Amendment, which "protects only the carrying of weapons that are those in common use at the time." *Bruen*, 597 U.S. at 47 (cleaned up). Of the four that are arguably relevant (the Jennings, Pepperbox, Colt, and Winchester), there is no evidence any could be fired as rapidly as a modern handgun. All but the Jennings were also prone to jamming or to misfiring. As a result, none had nearly the same potential for mass shootings as does an ELCM.

Contrary to Hanson's assertions, none of his examples is a functional analogue to a modern gun with a detachable ELCM. We do not expect to find an historical tradition of regulating handguns with detachable magazines before ratification of the Fourteenth Amendment, much less ratification of the Second Amendment, because there was then no "relevantly similar" weapon "in common use," until the late 19th or early 20th century, when the Mauser C96 semi-automatic pistol entered circulation.[11]

---

[11] Although the Mauser C96 semi-automatic pistol is relevantly similar to a modern handgun with an ELCM, it and similar weapons that postdate the ratification of the Fourteenth Amendment represent dramatic technological advances over Founding- and Reconstruction-era firearms.

\*    \*    \*

Because ELCMs implicate unprecedented societal concerns and dramatic technological changes, the lack of a "precise match" does not preclude finding at this preliminary juncture an historical tradition "analogous enough to pass constitutional muster." Therefore, we hold Hanson is not sufficiently likely to succeed on the merits of his claim to warrant the entry of a preliminary injunction against enforcement of the magazine cap.

## IV. Other Preliminary Injunction Factors

In addition to establishing a likelihood of success on the merits, a party seeking a preliminary injunction must make a "clear showing" that "it will likely suffer irreparable harm before the district court can resolve the merits of the case," that "the balance of equities favors preliminary relief," and that "an injunction is in the public interest." *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022); *see also Winter*, 555 U.S. 7, 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." (citing *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313 (1982))). Those factors enforce a vital, structural limitation on the role of courts. Unlike the Political Branches, courts are institutionally reactive. Our authority to alter legal rights and obligations generally derives from — rather than precedes — our determination of the merits. Said another way, "[t]he judicial power is inseparably connected with the judicial duty to decide cases and controversies by determining the parties' legal rights and obligations," and a "preliminary injunction is remarkable because it imposes a constraint on the enjoined party's actions in advance of any such determination." *O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1014 (10th Cir. 2004) (McConnell, J., concurring);

*see Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 199 (3d Cir. 2024) ("Because injunctions can irreparably injure parties, courts must use great caution, granting them only in cases where they are clearly indispensable to the ends of justice") (cleaned up).

On the record before us, Hanson has failed to show that the preliminary injunction factors warrant the "extraordinary remedy" of a preliminary injunction that would alter a 15-year status quo and effectively grant him the same relief he would obtain at the end of trial before that trial even starts.

The dissent analyzes none of the normal preliminary injunction factors, instead invoking the narrow exception for when "the merits of the plaintiffs' challenge are certain and don't turn on disputed facts." Dissent at 53 n.234 (citing *Wrenn v. D.C.*, 864 F.3d 650, 667 (D.C. Cir. 2017)). But that exception does not apply here, even if the dissent is right and we are wrong about the merits. No precedent dictates with certainty that, in confronting the unprecedented criminal and lethal misuse ELCMs have allowed, the District erred in capping magazine capacity at 10 rather than 17. Appellants, after all, do not argue in this motion that the Second Amendment prohibits any cap on magazine capacity for semiautomatic weapons. Nor does the dissent.

Instead, we assess all the preliminary injunction factors to determine whether we should act *despite* our uncertainty on an undeveloped record and amid factual disputes, rather than deciding before trial simply because we believe we must be right. After all, a preliminary injunction "is not a shortcut to the merits." *Delaware State Sportsmen's Assn*, 108 F.4th at 197.

## A.  Irreparable Harm

To begin, we note that irreparable harm, even when demonstrated, may be insufficient on its own to warrant a preliminary injunction.   "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff."  *Yakus v. United States*, 321 U.S. 414, 440 (1944).  The purpose of a preliminary injunction is not to prevent all harm but "merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Starbucks Corp. v. McKinney*, 602 U.S. ---, 144 S. Ct. 1570, 1576, (2024).

Nor does the alleged deprivation of a constitutional right constitute irreparable harm.  Even in the sensitive areas of freedom of speech and religion, where the risk of chilling protected conduct is especially high, we do not "axiomatically" find that a plaintiff will suffer irreparable harm simply because it alleges a violation of its rights.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 302 (D.C. Cir. 2006).  Rather, a plaintiff must show why the court will be unable to grant meaningful relief following trial.  Thus, far from treating the Second Amendment as a "second-class right," *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010), we assess Hanson's claim of irreparable harm using the same standard we apply to all fundamental rights.

Hanson has not come forward with a factual record showing that he will be *irreparably* harmed if he is required to wait until the court hears his case before obtaining larger-capacity magazines for his firearms.  "Irreparable harm," in this context, refers to harm within a specific timeframe.  That is, Hanson must demonstrate injury that is sufficiently certain, persuasively demonstrated, and so clearly irremediable that it

warrants a court reaching out to alter the status quo before the merits are resolved. *See O Centro Espirita*, 389 F.3d at 1013 ("[T]here are cases in which preservation of the status quo may so clearly inflict irreparable harm on the movant, with so little probability of being upheld on the merits, that a preliminary injunction may be appropriate even though it requires a departure from the status quo").

Hanson rests his entire irreparable harm showing on the argument that the District's magazine cap burdens his Second Amendment right to use magazines of between 11 and 17 rounds for self-defense. *See* Oral Arg. Tr. 11:20–12:22 (counsel for Hanson explaining that the largest magazine that Hanson "possess[es]" and "want[s] to carry in the District" holds 17 bullets); Oral Arg. Tr. 14:17–25 (similar); *see also id.* at 9:20–13:13 (counsel for Hanson acknowledging that the requested preliminary injunction is limited to Hanson's as-applied challenge); *id.* at 77:20–23 ("[T]he imposition, the actual threat to the right here is the ability for my clients to bear an arm that they've decided is necessary for their self-defense purposes."); *id.* at 20:9–21:3 (counsel for Hanson acknowledging that self-defense is the operative Second Amendment interest for their preliminary-injunction request). But Hanson does not offer any factual showing of irreparable harm to his self-defense interest.

*First*, Hanson has not provided any specific explanation of the irreparable harm he faces from having the ability to fire 11, but not 18, rounds without pausing during the pendency of this litigation. [12] In fact, each of the appellants owns at least one

---

[12] The District's magazine cap permits Hanson to fire 11 rounds without pausing — 10 rounds in the magazine, plus one round in the chamber. Hanson seeks to use 17-round magazines that would enable him to fire 18 rounds without pausing — 17 rounds in the magazine, plus one round in the chamber.

handgun for which the standard-issue magazine contains 10 or fewer rounds. *See* J.A. 181–185. And the standard-issue magazine for six of the 13 firearms at issue in this as-applied challenge likewise contains no more than 10 rounds. *See* J.A. 181–185. Hanson, having limited his injunctive request to his as-applied challenge, does not allege that he faces difficulty obtaining such standard-issue magazines, and he does not identify any irreparable harm to his self-defense that will arise if he is limited to using the magazines that he already owns while the merits of his constitutional challenge to the District's magazine cap are resolved.

Hanson protests that he faces irreparable harm from the District's magazine cap because it prevents him from "be[ing] prepared for th[e] unthinkable circumstance where [he] might need to use more than [10] rounds." Oral Arg. Tr. 75:22–23; *see id.* at 75:22–76:6; *see also id.* at 72:23–78:1. But Hanson concedes that such circumstances are, at most, "rare" and "unusual." *Id.* at. 74:25, 75:6; *see id.* at 76:17–24. The Supreme Court has held that "simply showing some *possibility* of irreparable injury" is not sufficient to make the irreparable harm showing needed to obtain preliminary relief. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (emphasis added; quotations omitted). Yet in Hanson's own words, he has raised only remote conjecture. *See* Oral Arg. Tr. 75:22–23, 74:25, 75:6.

Highlighting that point, Hanson himself has explained that, "[i]n most self-defense circumstances, pulling out a weapon and brandishing it will scare off somebody else." Oral Arg. Tr. 75:9–10. In addition, Hanson's own evidence in support of a preliminary injunction shows that "the average amount of rounds fired in self-defense is usually less than 10" and "generally only two or three." J.A. 721 (Decl. of John Murphy); *see id.* at 1039–1040 (district court noting that a prior study conducted by one of Hanson's experts "concluded that

the average number of shots a civilian fired in a self-defense incident [between 1997 and 2001] was 2.2"). Hanson, in short, has not shown that there will be any "time-sensitive" actual effect on his ability to engage in self-defense while this litigation proceeds. *See Del. State Sportsmen's Ass'n.*, 108 F.4th at 205 (declining preliminarily to enjoin a similar magazine-size cap when there was "scant evidence" of any "time-sensitive need" for larger magazines than the law allowed).

*Second*, Hanson himself does not argue that *any* restriction on magazine capacity would inflict irreparable harm on his Second Amendment rights. He, in fact, agrees with the District that the Second Amendment does not protect magazines of all sizes, and he concedes that there is a magazine capacity that the District can constitutionally limit. *See* Oral Arg. Tr. 7:23–10:24 (counsel for Hanson conceding that the District could ban magazines not in common use for self-defense). He simply disagrees with where the District has drawn that line. But that type of close line-drawing regarding how many bullets to permit in a magazine while litigation is pending does not, without something more concrete than fear of the "unthinkable," bespeak irreparable harm. *Cf. Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) ("Making distinctions . . . where line-drawing is inherently complex, may call for a far more serious invasion of the legislative domain than we ought to undertake.") (cleaned up).

*Third*, Hanson has evidenced no urgency in obtaining relief in this litigation. He consented to a stay of district court proceedings pending resolution of this appeal while at the same time failing to seek expedited review from this court. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018). Although consenting to a stay or declining to seek

expedited review on appeal will not always establish lack of diligence on the part of the party seeking injunctive relief, such action, when unexplained, undercuts claims of irreparable harm. Hanson's unhurried litigation tactics counsel against a finding of irreparable harm here.

## B. Balance of the Equities

Finally, the balance of equities also weighs against granting a preliminary injunction at this time. A party seeking a preliminary injunction must show that "the balance of equities favors preliminary relief" and that "an injunction is in the public interest." *Singh*, 56 F.4th at 95. In analyzing this record, we must carefully balance the equities by weighing the harm to the moving party and the public if there is no injunction against the harm to the government and the public if there is. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12–14 (D.C. Cir. 2016).

On the District's side of the balance is the governmental interest in enforcing its duly enacted law, and the likelihood of "concrete harm to [the District's] law enforcement and public safety interests" were we to grant a preliminary injunction. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The District has demonstrated that it will likely suffer irreparable harm if an injunction issues. Even at this preliminary stage, the record contains evidence that the District would experience an influx of ELCMs if this court were to preliminarily enjoin the District's magazine cap. *See* J.A. 119. The District notes that over one million ELCMs "flooded into California in the brief [one-week] period *after* [California's ELCM cap] was enjoined but *before* the ruling was stayed by the district court." District Br. 51 (citing Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED

(Apr. 12, 2019), https://perma.cc/65NQ-Z6D6). Hanson has not offered any evidence that rebuts this claim or that shows the District would not face similar harm were an injunction to issue here.

The District's harm, moreover, encompasses not only the likely proliferation of ELCMs, but also the uses to which those magazines can be put. The District submitted expert testimony that ELCMs are "extraordinarily lethal" when used in combination with semiautomatic firearms, increasing the number of individuals killed in mass shootings and other criminal activity. J.A. 477; *see id.* ("Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns [cause] 11 percent more than regular firearms. But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns [cause] 184 percent more than regular firearms."). The District has a particular and unique interest in reducing that lethality "given homeland security issues in the District" as the seat of the federal government and the location of countless sensitive governmental institutions and protected personnel. Br. of Appellee 4 (quoting Committee on Pub. Safety and the Judiciary, D.C. Council, Report on Bill 17-843, at 9 (2008)).

Hanson, for his part, asserts the public's interest in exercising the Second Amendment right to bear constitutionally protected arms. *Cf. Singh*, 56 F.4th at 107 ("On the Plaintiffs' side of the balance is the weighty public interest in the free exercise of religion that RFRA protects").

Yet the mere fact that Hanson seeks to enjoin the District's magazine cap on constitutional grounds does not decide our balance-of-the-equities inquiry. To the contrary, this court

must balance the equities of the parties and the public even when a party seeks to restrain the enforcement of an allegedly unconstitutional law. *See Singh*, 56 F.4th at 107–109; *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334–335 (D.C. Cir. 2018). Furthermore, we have stated that the public interest in such cases "rises and falls with the strength of [the moving party's] showing" on the merits. *Archdiocese of Wash.*, 897 F.3d at 335. While "[t]he public interest favors the protection of constitutional rights," Hanson would need to establish a likely violation of his constitutional rights to establish that the public interest outweighs the District's unrebutted showing of substantial harm, a showing he has not made. *Id.* (explaining the parties' relative equities might balance differently if the plaintiffs had established a likelihood of success on the merits of their constitutional claim and, in turn, that the public interest favored an injunction).

In addition, Hanson is seeking at this preliminary stage a longstanding-status-quo-altering injunction that effectively gives him the full relief he would receive if he won on the merits. Preliminary injunctions, though, "are generally a 'stopgap measure' meant only to 'preserve the relative positions of the parties' until trial." *Singh*, 56 F.4th at 95 (quoting *Sherley v. Sebelius*, 689 F.3d 776, 781–782 (D.C. Cir. 2012)). "After all, 'deciding whether to grant a preliminary injunction is normally to make a choice under conditions of grave uncertainty.'" *Id.* (quoting *O Centro Espirita*, 389 F.3d at 1015). Because "a grant of preliminary relief could prove to be mistaken once the merits are finally decided," courts must be "institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits." *Id.* (quotations omitted). At bottom, that "reluctance to disturb the status quo prior to trial on the merits is an expression of judicial humility." *O Centro Espirita*, 389 F.3d at 1015.

Concern about so materially altering the status quo has particular purchase on the record of this case. For 15 years, District law enforcement has operated and been resourced with the magazine cap in place. The District has also shown that an erroneously issued preliminary injunction suspending its law could drastically compromise the District's ability to enforce its magazine cap far into the future — long beyond the term of the preliminary injunction itself — because of the likelihood that ELCMs will flood into the District during any such injunctive relief. Hanson, in contrast, would suffer from an erroneous preliminary analysis of his claim for a far shorter time while the merits of this case are resolved. Those unequal consequences carry material weight in the equitable preliminary-injunction calculus. *Cf. Singh*, 56 F.4th at 97 ("The public consequences of employing the extraordinary remedy of injunction necessarily include the risk that the relief requested will cause unusual disruption if granted in error, for example by disturbing the status quo in a way that cannot readily be undone.") (cleaned up).

Finally, we cannot simply rebalance the equities by limiting injunctive relief to the four appellants in this case. Were this court to direct the issuance of such a preliminary injunction, a follow-on class-action suit seeking the same relief would inevitably follow and almost inevitably have to be granted. Allowing preliminary injunctive relief in such a case would ultimately result in the very harms to the public interest detailed above. As a result, the balance of the equities in this case does not favor a preliminary injunction, no matter the injunction's scope.

In sum, a "judicial version of Hippocrates' ancient injunction to physicians — above all, to do no harm — counsels against forcing changes before there has been a determination

of the parties' legal rights" and in favor of maintaining the status quo. *O Centro Espirita*, 389 F.3d at 1012. Hanson has not, on the record before us, shown the type of irreparable harm and favorable balancing of equities and interests that can warrant the exceptional relief of a status-quo-altering injunction handing him the same relief he would ordinarily obtain only after prevailing on the merits.

## V.  Summary and Conclusion

Because Hanson has failed to demonstrate a likelihood of success on the merits or that he has suffered irreparable harm, and because the balance of equities does not weigh in his favor, the order of the district court is

*Affirmed*.

**Appendix: Historical Firearms**

Hanson offers a plethora of historical examples to argue that extra-large capacity magazines (ELCMs) are nothing new. For the reasons given below, each of his examples misses the mark.

His first example is a 16-shot wheellock created around 1580. *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 852 & n.21 (2015) (citing Lewis Winant, *Firearms Curiosa* 168–70 (Ishi Press Int'l 2009) (1954)). The wheellock lacks both the rapid-reloading capability and the trigger control of a modern semi-automatic handgun with a detachable magazine, which limited its potential lethality. One wheel lock would ignite a fuse and fire the ten upper charges without stopping and another wheel lock would fire the remaining six lower charges. This gun was "very rare," however; indeed, it may have been a one-off, arti-sanal curiosity. Winant, above, at 168–70; *see A 16-Shot Wheel Lock*, America's 1st Freedom (June 2014), https://web.archive.org/web/20140702092902/https:/www.nra publications.org/index.php/17739/a-16-shot-wheel-lock/ (noting the "highly decorated" and "unique rifle" had "achieved a multi-shot capability that would not be reached again until the American Civil War").

Hanson also directs us to the "Puckle Gun," patented in 1718, which he describes as one of "the more successful of the early designs" of multi-shot firearms. But the Puckle Gun never entered commercial production; only two prototypes were made; and they suffered from mechanical problems. Br. of Amici Curiae Brady Center to Prevent Gun Violence et al. (Brady Br.) at 10–11. Even if it had entered commercial production, however, the Puckle Gun still would not be a "relevantly similar" analogue: It was mounted on a tripod and

operated by hand crank, making it more akin to a Gatling gun than to a semiautomatic handgun with an ELCM.



U.K. Patent No. 418 (issued May 15, 1718).

Hanson next proffers the Girandoni air rifle, invented in 1779. The Girandoni rifle was never in common use: Only around 1,500 were produced and even fewer made their way to America. Robert J. Spitzer, *Understanding Gun Law History after Bruen: Moving Forward by Looking Back*, 51 FORDHAM URB. L.J. 57, 76–77 (2023); *see also* John Plaster, *The History of Sniping & Sharpshooting* 70 (2008). It remained such a curiosity that, in 1792, one museum proprietor in New York charged visitors six pence to see it discharge a shot. Gardiner Baker, *To the Curious*, The Weekly Museum (New York, NY), Feb. 11, 1792.

Hanson's next example, the Jennings multi-shot flintlock rifle, was beset by "technical challenges." *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 974 F.3d 237, 255 (3d Cir. 2020) (Matey, J., dissenting) (cleaned up), *cert. granted, judgment vacated sub nom. Ass'n of N.J. Rifle & Pistol Clubs v. Bruck*, 142 S. Ct. 2894 (2022). The rifle has a "complicated mechanism" with a moving hopper and swivel covers that required a hammer to be pulled back for each shot. Corey R. Wardrop, *A Close-up Look at the Ellis-Jennings Repeating Flintlock Rifle*, THE FIREARM BLOG (July 27, 2017), https://web.archive.org/web/20220402053233/https://www.thefirearmblog.com/blog/2017/07/27/close-look-ellis-jennings-repeating-flintlock-rifle/. Moreover, most of these rifles had a capacity of only four shots, and only 521 were ever made. *Id.*

Hanson also points to "Pepperbox" pistols, which were capable of firing only "five or six rounds without reloading," and therefore are not comparable in lethality to a modern ELCM. Brady Br. at 13 (citing *Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, THE FIREARM BLOG (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62)) (cleaned up). Pepperbox pistols were also prone to "chain-firing," that is, all barrels firing at once. *Id.*

Next is the Colt revolver, introduced in 1836. *See* Improvement in Fire-Arms, U.S. Patent No. 9430X (issued Feb. 25, 1836). The Colt revolver "was the first widely used multishot weapon," Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America 401 (2020), but the shooter was required to cock the hammer before firing each round; the gun was limited to six shots; it was prone to jamming; and, unlike a handgun with an ELCM, it could not be rapidly reloaded. The six-shooter is not a relevant comparator because the District *allows* six-shooters. Its magazine cap is set at 10 (plus one in the chamber).

Hanson next points to the Bennet & Haviland Revolving Rifle, which began circulating in 1838, as well as the similar Porter and Hall rifles of the 1850s.  There is no evidence that any of these rifles were in common use.  John Paul Jarvis, *Bennet & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain*, GUNS.COM (Apr. 3, 2012 5:44 PM), https://perma.cc/6FLX-AE5G ("experts believe that Bennett & Havilland made fewer than 10 full-scale" rifles); *Ian* McCollum, *RIA: Porter Turret Rifle*, FORGOTTEN WEAPONS BLOG (Feb. 7, 2016), https://perma.cc/N5J5-R93H (only "several thousand examples" of the Porter rifle were made); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and their Values* 713 (9th ed. 2007) (noting an unknown quantity were made and the rifle is "[v]ery rare").

The other antebellum firearms Hanson identifies — the Enouy Ferris wheel revolver, the Jarre harmonica pistol, and pin-fire revolvers — all have similar limitations.  None was ever in common use — indeed, the Enouy Ferris wheel revolver may have been a one-off curiosity.  Dan Zimmerman, *Is the 48-Shot Enouy the Most Unusual Revolver in History?*, THE TRUTH ABOUT GUNS (Oct. 18, 2015), https://perma.cc/6FW9-J27J (noting "[t]here are no records of it ever being manufactured or sold commercially").  Those that were capable of firing more than six shots tended to be cumbersome and unwieldy, limiting their potential lethality.

45



Lewis Winant, *Firearms Curiosa* 207 (Greenberg 1955) (1954) (depicting the Ferris wheel revolver).  Although one version of the Jarre harmonica pistol did have a detachable magazine, it still required the hammer to be cocked before firing each round, *id.* at 244–45, and "[t]he particularly awkward design of the pinfire cartridge made it difficult to deploy in a repeating pistol." *Unique Handgun Detail*, THE HANDGUN INFORMATION RESOURCE (2024), https://perma.cc/6PVH-LWDD.

Hanson's next example, the Josselyn belt-fed chain pistol (patented in 1866), was likewise unwieldy and was likely never in common use.  As with the Colt revolver, the need to cock the hammer before firing each round limited the rate of fire and therefore the potential lethality of the weapon. *Chain Guns—I,* FIREARMS HISTORY, TECHNOLOGY & DEVELOPMENT BLOG (July 23, 2014 1:35 AM), https://perma.cc/MT7P-JP5L.



Improvement in Revolving Fire-Arms, U.S. Patent No. 52,248 (issued Jan. 24, 1866).

Hanson also argues the Winchester Repeater rifle of 1866 is analogous to an ELCM. Although it had a magazine capable of firing more than ten rounds without reloading, it required manual manipulation of a lever in between each shot. Ryan Hodges, *The 1866 Rifle*, TAYLOR'S & COMPANY (Aug. 26, 2020), https://perma.cc/7STW-8WMS. The magazine was also exposed, which made it susceptible to jamming. *Id.* For this reason, the rifle lacks the potential lethality of a modern weapon equipped with an ELCM.

WALKER, *Circuit Judge*, dissenting:

In *District of Columbia v. Heller*, the Supreme Court held that the government cannot categorically ban an arm in common use for lawful purposes. Magazines holding more than ten rounds of ammunition are arms in common use for lawful purposes. Therefore, the government cannot ban them.

## I. Background

In 2003, Dick Heller and five other plaintiffs alleged that the District of Columbia's ban on handguns violated their Second Amendment right to "keep and bear Arms."[1] Five years later, the Supreme Court agreed.[2] It held D.C.'s law unconstitutional because the law banned an arm "in common use" for lawful purposes.[3]

A month after Heller's victory, he returned to federal court.[4] This time, in *Heller II*, he challenged D.C.'s felony prohibition on possessing what D.C. calls a "large capacity ammunition feeding device" — defined as "a magazine, belt,

---

[1] U.S. Const. amend. II.

[2] *District of Columbia v. Heller*, 554 U.S. 570, 635-36 (2008).

[3] *Id.* at 624, 627 (cleaned up); *see also id.* at 629.

When I refer to a ban on arms in common use for lawful purposes, I mean a *complete* ban that covers everyone, everywhere — not, for example, targeted "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *id.* at 626-27, or "prohibitions on carrying concealed weapons," *id.* at 626, or the disarming of individuals who pose "a credible threat to the physical safety of others," *United States v. Rahimi*, No. 22-915, 602 U.S. \_\_\_, slip op. at 15 (June 21, 2024).

[4] *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*).

drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition."[5]   D.C.'s ban on these plus-ten magazines is categorical; it extends to every purpose (even self-defense) and to every location (even inside the home).[6]

Heller lost his second suit before a divided panel of this court.  It upheld D.C.'s ban on plus-ten magazines because the ban was substantially related to an important government interest.[7]  But this court's decision in *Heller II* was effectively overruled in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[8]  There, the Supreme Court reaffirmed its holding in *Heller I* and repudiated "means-end scrutiny in the Second Amendment context."[9]

---

[5] D.C. Code § 7-2506.01(b) (2009); *see Heller II*, 670 F.3d at 1249.

  *Heller II* also included challenges to D.C.'s ban on semi-automatic rifles and its gun registration and licensing requirements.  670 F.3d at 1248-49.

[6] The prohibited magazines are neither unusually "large," D.C. Code § 7-2506.01(b) (2013), nor "extra-large," Majority Op. at 5.  *See infra* Part III.A.  So I will simply call them "plus-ten magazines." *Cf. Duncan v. Bonta*, 19 F.4th 1087, 1140 n.1 (9th Cir. 2021) (*Duncan II*) (en banc) (Bumatay, J., dissenting) ("we would be more correct to refer to" plus-ten magazines as "standard-capacity magazines," rather than "large-capacity magazine[s]" (cleaned up)), *cert. granted, judgment vacated, and remanded*, 142 S. Ct. 2895 (2022), *and vacated and remanded by Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022).

[7] *Heller II*, 670 F.3d at 1263-64; *cf. Heller v. District of Columbia*, 801 F.3d 264, 274-80 (D.C. Cir. 2015) (*Heller III*) (applying means-end scrutiny to D.C.'s gun registration regime).

[8] 142 S. Ct. 2111 (2022).

[9] *Id.* at 2127; *see id.* at 2125-27.

After *Bruen*, Andrew Hanson and three other D.C. residents filed this suit. They own handguns, as well as magazines that hold up to 17 rounds of ammunition. Because of D.C.'s ban on plus-ten magazines, they must store those magazines outside of D.C., away from their homes.

These gun owners sought a permanent injunction and a declaration that D.C.'s ban is unconstitutional. Simultaneously, they requested a preliminary injunction permitting them to keep their up-to-17-round magazines with their handguns in D.C. while this suit proceeded.

The district court found that the gun owners were not likely to succeed on the merits.[10] So it denied the preliminary injunction without assessing any other equitable factors.[11] The gun owners appealed, requesting a preliminary or permanent injunction.

Because the district court's decision depended entirely on a legal conclusion — that the government can categorically ban an arm in common use for lawful purposes — review is de novo.[12]

---

[10] *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 3 (D.D.C. 2023).

[11] *Id.*; *see Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (a party seeking a preliminary injunction must show that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest").

[12] *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## II. The Government Cannot Ban Arms in Common Use for Lawful Purposes

The Second Amendment guarantees law-abiding citizens a right against categorical bans of an arm in common use for lawful purposes. What follows is the story of how the Supreme Court came to affirm that right — and then reaffirm it over and over and over again.

### A. Text and History

I begin with a much-abbreviated version of the history that informs the Second Amendment.[13] My hope here is to provide any readers new to this topic with a prologue to the Supreme Court's Second Amendment jurisprudence. Later, I'll explain why that jurisprudence holds that the government cannot ban an arm in common use for lawful purposes.

### 1. The English Bill of Rights and Colonial History (1689-1775)

In the 1660s, Britain's Stuart king began to disarm Protestants and other politically disfavored subjects.[14] After the Stuarts' ouster and exile in 1688, King William and Queen Mary assented to a parliamentary declaration that became the

---

[13] Some of the finest judges in the country have written detailed accounts of that history, which I commend to the interested reader. The most recent example is Judge Richardson's excellent dissent in *Bianchi v. Brown*, No. 21-1255, 111 F.4th __, slip op. at 85-183 (4th Cir. Aug. 6, 2024) (en banc). Others are cited throughout this opinion.

[14] *Heller*, 554 U.S. at 592-93.

5

1689 English Bill of Rights.[15] It "explicitly protected a right to keep arms for self-defense."[16]

"As English subjects," American "colonists considered themselves to be vested with the same fundamental rights as other Englishmen."[17] That included the "right of self-preservation" to "repel force by force."[18] So when King George III tried "to disarm the colonists just as the Stuarts attempted to disarm Protestants," his attempts "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms."[19]

Then, in 1775, the "spark that ignited the American Revolution was struck at Lexington and Concord, when the

---

[15] *Id.* at 593; *Duncan v. Becerra*, 970 F.3d 1133, 1144 (9th Cir. 2020) (*Duncan I*) (panel), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan II*, 19 F.4th 1087.

[16] *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010); *see also* 1 W. & M., ch. 2 (1689) ("That the Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law."), *in* 6 Statutes of the Realm at 143.

In a reversal of the Stuart Era, the English Bill of Rights extended gun rights only to Protestants. But by 1765, though anti-Catholic politics and prejudice persisted, "the right to keep and bear arms was one of the fundamental rights of Englishmen." *McDonald*, 561 U.S. at 768 (cleaned up) (noting that Blackstone recognized this fundamental right in 1765).

[17] *McDonald*, 561 U.S. at 816 (Thomas, J., concurring in part and concurring in the judgment).

[18] *Heller*, 554 U.S. at 595 (cleaned up) (citing 1 William Blackstone, *Commentaries* at *145 n.42 (1803) (notes of St. George Tucker)).

[19] First quoting *Duncan I*, 970 F.3d at 1153; then quoting *McDonald*, 561 U.S. at 768 (cleaned up).

British governor dispatched soldiers to seize the local farmers' arms and powder stores."[20]

## 2. The Second Amendment, State-Constitution Analogues, and the "Palladium of the Liberties of a Republic" (1775-1833)

The American Revolution led to Western Civilization's "seminal era of constitution writing."[21] The thirteen states "created the first thirteen constitutions in this country, indeed many of the first constitutions in the world."[22] Almost immediately, four of them guaranteed gun rights.[23]

By 1787, the nation was debating whether to ratify the United States Constitution, proposed by that summer's Philadelphia Convention.[24] In that debate, "the fear that the Federal Government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric."[25] "In response, the Federalists agreed to include a Bill of Rights, which, of course,

---

[20] *Rahimi*, slip op. at 5; *Duncan I*, 970 F.3d at 1153.

[21] Jeffrey S. Sutton, *51 Imperfect Solutions: States and the Making of American Constitutional Law* 11 (2018).

[22] *Id.* at 10.

[23] *Heller*, 554 U.S. at 600-02; *see also McDonald*, 561 U.S. at 769.

[24] *Heller*, 554 U.S. at 598-99 (discussing ratification debates).

[25] *Id.* (citing Letters from The Federal Farmer III (Oct. 10, 1787), *in* 2 The Complete Anti-Federalist 234, 242 (H. Storing ed. 1981), and 2 Documentary History of the Ratification of the Constitution 508-09 (M. Jensen ed. 1976) (comments of John Smilie at the Pennsylvania ratifying convention)).

featured the right to bear arms."[26]  Its Second Amendment provides:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.[27]

In the three decades that followed ratification of the Bill of Rights, nine more states guaranteed gun rights in their constitutions.[28]  After that, as new states joined the Union, many of their constitutions made similar guarantees.[29]  They reflected what Joseph Story observed in 1833: "The right of the

---

[26] *Duncan I*, 970 F.3d at 1144.

[27] U.S. Const. amend. II.

[28] *See McDonald*, 561 U.S. at 769.

[29] *See, e.g.*, An Act to Provide for the Due Execution of the Laws of the United States Within the State of Michigan, ch. 239, sec. 1, 5 Stat 61, 61 (1836) (applying United States law to Michigan); An Act to Admit the State of Michigan into the Union, upon an Equal Footing with the Original States, ch. 6, sec. 1, 5 Stat. 144, 144 (1837) (formally admitting Michigan as a state); Mich. Const. of 1835, art. I, § 13 ("right to bear arms"); An Act for the Admission of the State of Arkansas into the Union, and to Provide for the Due Execution of the Laws of the United States, Within the Same, and for Other Purposes, ch. 100, secs. 1 & 3, 5 Stat. 50, 50-51 (1836) (admitting Arkansas); Ark. Const. of 1836, art. II, § 21 ("right to keep and to bear arms"); An Act to Extend the Laws of the United States over the State of Texas, and for Other Purposes, ch. 1, sec. 1, 6 Stat. 1, 1 (1845) (annexing Texas); Tex. Const. of 1845, art. I, § 13 ("right to keep and bear arms"); An Act for the Admission of Iowa and Florida into the Union, ch. 48, sec. 1, 6 Stat. 742, 742 (1845) (admitting Florida); An Act Supplemental to the Act for the Admission of Florida and Iowa into the Union, and for Other Purposes, ch. 75, sec. 2, 6 Stat. 788, 788 (1845) (formally applying United States law to Florida); Fla. Const. of 1838, art. I, § 21 ("right to keep and to bear arms").

citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic . . . ."[30]

### 3. The Fourteenth Amendment
### (1868)

Just as guns were often the difference between life and death for "the remote settler" who needed "to defend himself and his family against hostile Indian tribes and outlaws, wolves and bears,"[31] guns were often the only defense for African-Americans against night riders and lynch mobs after the Civil War.[32] So when states "of the old Confederacy" engaged in "systematic efforts . . . to disarm" recently freed slaves and "many of the over 180,000 African-Americans who served in the Union Army," Congress passed the Freedmen's Bureau Act

---

[30] 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833); *see also McDonald*, 561 U.S. at 769-70 (citing "Founding-era legal commentators" including Joseph Story, St. George Tucker, and William Rawle).

[31] Oral Arg. Tr. at 8 (comment of Kennedy, J.), *District of Columbia v. Heller*, 554 U.S. 570 (2008) (No. 07-290), 2008 WL 731297.

[32] *McDonald*, 561 U.S. at 855-58 (Thomas, J., concurring in part and concurring in the judgment); *see also Duncan I*, 970 F.3d at 1154 (The NAACP's co-founder once wrote of a year plagued by racial lynchings in the late nineteenth century, "the only case where the proposed lynching did *not* occur, was where the men armed themselves . . . and prevented it. The only times an Afro-American who was assaulted [and] got away has been when he had a gun and used it in self-defense." (quoting Ida B. Wells, *Southern Horrors and Other Writings: The Anti-Lynching Campaign of Ida B. Wells, 1892-1900*, at 70 (Jacqueline Jones Royster ed., 1997))).

of 1866.[33] It guaranteed "the constitutional right to bear arms" to all citizens "without respect to race or color."[34]

That same year, Congress enacted the Civil Rights Act.[35] Its "principal proponents . . . meant to end the disarmament of African-Americans in the South."[36] Then, "to provide a constitutional basis for protecting the rights set out in the Civil Rights Act of 1866," Congress passed and the states ratified the Fourteenth Amendment.[37] Its first section provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[38]

### 4. Takeaways from the Second Amendment's Text and History

D.C. has offered no reason to doubt that throughout all of this history, no federal or state legislature enacted a blanket ban on a gun in common use for lawful purposes. Yes, there could

---

[33] *McDonald*, 561 U.S. at 771.

[34] Ch. 200, § 14, 14 Stat. 173, 176-177 (1866).

[35] Ch. 31, 14 Stat. 27 (1866).

[36] *McDonald*, 561 U.S. at 774 n.23.

[37] *Id.* at 775.

[38] U.S. Const. amend. 14 § 1; *see also id.* § 5 (granting Congress enforcement power).

be limits on *who* possesses a gun.[39]  Yes, there could be limits on *where* and *how* you carry a gun.[40]  And yes, there could be limits on owning and carrying *unusual* guns.[41]  But D.C. has failed to identify any categorical ban on a gun in common use for lawful purposes in the first century of our nation's history.[42]

## B. Supreme Court Precedents

The Supreme Court's first notable application of the Second Amendment did not occur until 1939 — when it distinguished unusual weapons from those in common use.[43] And its first extensive consideration of the Amendment's meaning did not come until 2008 — when it relied on this distinction to hold that the government cannot completely ban an arm in common use for lawful purposes.  In the 16 years since then, the Court has invariably reaffirmed that principle.

---

[39] *Rahimi*, slip op. at 10-13 (citing Founding-era "regulations targeting individuals who physically threatened others").

[40] *Bruen*, 142 S. Ct. at 2133 (citing examples of "sensitive places" where weapons were historically prohibited).

[41] *Heller*, 554 U.S. at 627 (explaining that there is an "historical tradition of prohibiting the carrying of dangerous and unusual weapons" (cleaned up)).

[42] *See Bruen*, 142 S. Ct. at 2126 (it is the government's burden to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation").

[43] "For most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Heller*, 554 U.S. at 625.

## 1. *United States v. Miller*
## (1939)

In 1934, Congress enacted the National Firearms Act — the first significant federal gun law.[44] It regulated a special class of unusual firearms.[45] This class included fully automatic machine guns, sawed-off shotguns, and short-barreled rifles.[46]

The National Firearms Act required pre-existing owners to register those firearms.[47] It also compelled sellers and transferors to pay special taxes.[48] So obtaining a covered arm became expensive, but not illegal.

The Supreme Court upheld the National Firearms Act in *United States v. Miller*.[49] There, "two washed-up Oklahoma bank robbers" had been charged with transporting an unregistered sawed-off shotgun in interstate commerce.[50] The

---

[44] National Firearms Act, Pub. L. No. 73-474, 48 Stat. 1236 (1934).

[45] *Id.* § 1(a), 48 Stat. at 1236.

[46] *Id.*

Machine guns are automatic weapons. *Id.* § 1(b), 48 Stat. at 1236 (defining "machine gun"). They fire "repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

[47] National Firearms Act, § 5(a), 48 Stat. at 1238.

[48] *Id.* §§ 2(a), 3(b), 48 Stat. at 1237.

[49] 307 U.S. 174, 183 (1939).

[50] Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48, 48 (2008); *see id.* at 50 (describing how *Miller* was a "test case arranged by the government and designed to support the constitutionality of federal gun control").

Court held that the Second Amendment does not protect "the right to keep and bear such an instrument."[51]

In explaining why, *Miller* referred to Founding-Era history. It observed that men called to serve in the militia "were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time."[52] Therefore, in the Court's view, the Second Amendment did not protect the weapon at issue in *Miller*, which was unusual at the time of the bank robbers' arrest.[53]

The Supreme Court has since "read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes,"[54] explaining (this time without the multiple negatives) that "*Miller* said . . . the sorts of weapons protected were those in common use at the time."[55]

## 2. *Staples v. United States* (1994)

Five and a half decades after *Miller*, the Supreme Court considered another case about the National Firearms Act — *Staples v. United States*.[56]

---

[51] *Miller*, 307 U.S. at 178.

[52] *Id.* at 179 (emphasis added); *see id.* at 179-82 (citing state laws *requiring* men to keep and bear commonly used firearms for militia service).

[53] *Id.* at 178.

[54] *Heller*, 554 U.S. at 625; *see also id.* at 623 (*Miller* recognizes that "the Second Amendment right, whatever its nature, extends only to certain types of weapons").

[55] *Id.* at 627 (cleaned up).

[56] 511 U.S. 600 (1994).

*Staples* reversed a conviction under the National Firearms Act for possession of an unregistered fully automatic machine gun.[57] The Court held that the government must (and did not) prove the defendant knew his AR-15 rifle had been converted to enable automatic fire.[58] That's because most modern guns are "so commonplace and generally available" that a defendant cannot be considered "on notice" of likely regulation just because a gun is dangerous.[59]

Consistent with *Miller*, *Staples* contrasted guns like a semiautomatic AR-15 rifle that "traditionally have been widely accepted as lawful possessions" with "certain categories" of unusual guns like fully automatic "machineguns, sawed-off shotguns, and artillery pieces."[60] So even though *Staples* was not a constitutional decision, it confirmed a principle that would matter in future cases about the Second Amendment: Arms in common use for lawful purposes are legally distinct from unusual, "quasi-suspect" arms.[61]

### 3. *District of Columbia v. Heller* (2008)

D.C. has long been an anti-gun outlier in a nation where, as *Staples* said, guns are "widely accepted as lawful possessions."[62] By 1976, D.C. had "banned all handgun

---

[57] *Id.* at 602.

[58] *Id.* at 603, 619.

[59] *Id.* at 611.

[60] *Id.* at 611-12.

[61] *See Heller II*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) (cleaned up).

[62] *Staples*, 511 U.S. at 612; *see id.* at 611-12.

possession."[63]  That ban was challenged by Dick Heller in a suit decided by the Supreme Court in 2008.[64]

During the litigation in *Heller*, D.C. made a series of arguments designed to render the Second Amendment a dead letter.  For starters, D.C. argued that the Second Amendment does not "entitle[] individuals to have guns for their own private purposes."[65]  Next, D.C. argued that there's no right to handguns when "the District allows residents to keep rifles and shotguns."[66]  Finally, D.C. argued that its "predictive judgment about how best to reduce gun violence was reasonable" and "entitled to substantial deference."[67]

In *District of Columbia v. Heller*, the Supreme Court rejected every one of D.C.'s arguments.[68]  In so doing, it made four increasingly specific holdings.  Each was dependent on the holding before it.

*Heller*'s **first holding** was its broadest: As a general matter, the Second Amendment guarantees an "individual right" to possess and carry "arms," though that right is "not unlimited."[69]

---

[63] *Wrenn v. District of Columbia*, 864 F.3d 650, 655 (D.C. Cir. 2017) (citing D.C. Code § 7-2502.01(a), 7-2502.02(a)(4)).

[64] *Heller*, 554 U.S. at 574-76.

[65] Petitioner Br. at 8, *Heller*, 554 U.S. at 570 (No. 07-290), 2008 WL 102223.

[66] *Id.* at 10; *see id.* at 48, 54-55.

[67] *Id.* at 11.

[68] *See* 554 U.S. 570, 628-29, 629, 634-36 (2008).

[69] *Id.* at 579-81, 581-92, 626-28.

*Heller*'s **second holding** concerned how to discover the Second Amendment's limits: Courts must rely "on the historical understanding of the Amendment to demark the limits on the exercise of that right."[70]  This historical approach led *Heller* to distinguish D.C.'s law from "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[71]  *Heller* thus "exemplifies" a "straightforward historical inquiry."[72]

In adopting this historical approach, "*Heller* decline[d] to engage in means-end scrutiny generally" and "specifically ruled out the intermediate-scrutiny test."[73]  The Court explained:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach.  The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.[74]

---

[70] *Bruen*, 142 S. Ct. at 2128 (describing *Heller*).

[71] *Heller*, 554 U.S. at 626-27.

[72] *Bruen*, 142 S. Ct. at 2131.

[73] *Id.* at 2129.

[74] *Heller*, 554 U.S. at 634; *see also id.* ("A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."); *id.* at 635 ("Like the First, [the Second Amendment] is the very *product* of an interest balancing by the people . . . .").

*Heller* then applied that "straightforward historical inquiry"[75] to reach its **third holding**: Whereas the United States has a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' there is no historical tradition of banning arms 'in common use.'"[76] So arms "in common use" are "protected," and "a complete prohibition of their use is invalid."[77]

*Heller*'s third holding confirmed the same critical distinction on which *Miller* had relied in 1939 — the distinction between "unusual" weapons versus weapons "in common use" for lawful purposes.[78] That distinction "dovetailed with the historical practice of the militia bringing 'the sorts of lawful weapons that they possessed at home to

---

[75] *Bruen*, 142 S. Ct. at 2131 (describing *Heller*).

[76] *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179) (cleaned up).

[77] *Id.* at 624, 627, 629; *see also Heller II*, 670 F.3d at 1269 (Kavanaugh, J., dissenting) (*Heller* held that the government cannot ban arms when "they have not traditionally been banned and are in common use by law-abiding citizens."); *id.* at 1271-72 (Kavanaugh, J., dissenting) ("As to bans on categories of guns, the *Heller* Court stated that the government may ban classes of guns that have been banned in our 'historical tradition' — namely, guns that are 'dangerous and unusual' and thus are not the sorts of lawful weapons that citizens typically possess at home." (cleaned up)); *id.* at 1272 (Kavanaugh, J., dissenting) ("The [*Heller*] Court said that 'dangerous and unusual weapons' are equivalent to those weapons not 'in common use,' as the latter phrase was used in *United States v. Miller*.").

[78] *Heller*, 554 U.S. at 623-25; *supra* Part II.B.1 (discussing *Miller*).

militia duty'; *i.e.*, weapons that were 'in common use at the time.'"[79]

From there, *Heller* reached its **fourth and final holding**: Because handguns are in common use today, law-abiding citizens have a Second Amendment right to keep them in their homes for self-defense.[80] It didn't matter whether D.C. residents could already keep other guns — it only mattered that handguns are in common use.[81] Nor did it matter whether handguns were once unusual — it only mattered that they are common now.[82]

*Heller* explained time and again that this fourth holding (a right to handguns) depended on its third holding (a right to possess arms "in common use" for lawful purposes):

- "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon."[83]

---

[79] Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *in Arms-Ban Cases — Again*, Harv. J.L. & Pub. Pol'y Per Curiam, No. 41, at 4 (2023) ("Smith, *How Courts Have Defied* Heller") (quoting *Heller*, 554 U.S. at 627).

[80] *Heller*, 554 U.S. at 628-29; *see also Bruen*, 142 S. Ct. at 2143 (discussing *Heller*).

[81] *Heller*, 554 U.S. at 629.

[82] *See id.* at 582 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding").

[83] *Id.* at 629.

- "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."[84]

- "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."[85]

- "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster."[86]

In other words, *Heller* did not simply hold that the Second Amendment is an individual right, then add a lot of dicta, and then finally hold that D.C. cannot ban handguns. What came between *Heller*'s first and last holdings is binding on lower courts, because each of *Heller*'s four increasingly specific holdings is dependent on the holding before it:

1) There is, in general, an individual right to keep and bear arms;

2) Exceptions to that right depend on the history and tradition of gun regulations;

3) There is no history and tradition of banning arms in common use for lawful purposes; and

4) Handguns cannot be categorically banned *precisely because* they are in common use for lawful purposes.

---

[84] *Id.* at 628.

[85] *Id.* at 629.

[86] *Id.* at 628-29 (cleaned up).

Of course, *Heller* did not ignore "the problem of handgun violence in this country."[87] It took "seriously the concerns" of those "who believe that prohibition of handgun ownership is a solution."[88] But the Court was bound by the Second Amendment's command that the government may not ban arms in common use for lawful purposes — whether good policy or not. As this court later recognized: "*Heller I* closed off the possibility" that we could "find some benefits weighty enough to justify other effective bans on the right to keep common arms."[89]

### 4. *McDonald v. City of Chicago* (2010)

Two years after *Heller*, in *McDonald v. City of Chicago*, the Supreme Court confirmed that because of the Fourteenth Amendment, "the Second Amendment right is fully applicable to the States."[90] *McDonald* explained that "the right to keep and bear arms is fundamental to our scheme of ordered liberty."[91] It is "'deeply rooted in this Nation's history and tradition.'"[92]

---

[87] *Id.* at 636.

[88] *Id.*

[89] *Wrenn*, 864 F.3d at 665. *But see Bianchi*, slip op. at 64 ("Imagine, then, *living* through these recent tragedies. Imagine the sense of loss that afflicts not only the moment, but the lifetimes of those families and friends affected. And then imagine that you mobilize and lobby your representatives to pass preventative legislation, only to be told by a court that your Constitution renders you powerless to save others from your family's fate." (emphasis omitted)).

[90] 561 U.S. 742, 750 (2010).

[91] *Id.* at 767 (emphasis omitted).

[92] *Id.* at 768 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

At the same time, "*McDonald* underscore[d] that text, history, and tradition guide analysis of gun laws and regulations."[93]  It confirmed that exceptions to the general right to keep and bear arms depend on "longstanding regulatory measures," not "judicial interest balancing," which *Heller* had "expressly rejected."[94]  And like *Heller*, it held that "citizens must be permitted to use handguns for the core lawful purpose of self-defense" *because* handguns "are the most preferred firearm in the nation to keep and use for protection of one's home and family."[95]

In *McDonald*, the Supreme Court had a chance to back away from *Heller*'s holdings.  Instead, it doubled down.

### 5. "Defiance" of *Heller*
### (2010-2022)

With *Heller* and *McDonald*, the Supreme Court left little doubt about the validity of severe gun-control regimes.  But revanchist legislatures responded with "defiance."[96]

D.C. led the way.  After its ban on keeping handguns was held unconstitutional, it followed "with a ban on carrying."[97] "And when *that* was struck down," D.C. confined "carrying a

---

[93] *Heller II*, 670 F.3d at 1278 (Kavanaugh, J., dissenting).

[94] *McDonald*, 561 U.S. at 785-86 (plurality); *see also id.* at 803 (Scalia, J., concurring) ("traditional, historically focused method").

[95] *Id.* at 767-68 (cleaned up).

[96] *Silvester v. Becerra*, 138 S. Ct. 945, 951 (2018) (Thomas, J., dissenting from denial of certiorari); *cf. Cooper v. Aaron*, 358 U.S. 1, 17 (1958) ("we should answer the premise of the actions of the Governor and Legislature that they are not bound by our holding in the *Brown* case").

[97] *Wrenn*, 864 F.3d at 655 (citing D.C. Code § 22-4504).

handgun in public to those with a special need for self-defense."[98]   D.C. then lost in court *again*, this time after arguing that the Second Amendment's "core does not cover public carrying at all."[99]

D.C.'s unveiled contempt for *Heller* and *McDonald* was not unique.  For example, the Massachusetts Supreme Judicial Court held that the Second Amendment does not protect stun guns[100] — a decision that the unanimous Supreme Court summarily reversed in *Caetano v. Massachusetts*.[101]  With a terse, two-page opinion, the Court dispensed with the state court's thin reasoning as patently "inconsistent" with the "clear" holdings of *Heller* and *McDonald*.[102]

*Caetano* put lower courts on notice: Exceptions to gun rights under the Second Amendment depend on a historical tradition of analogous regulations, and there is no historical tradition of banning arms in common use for lawful purposes.

Many state courts did not get the memo.  Nor did some federal circuit courts.

---

[98] *Id.* (citing *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) and D.C. Code § 22-4506(a)-(b)).

[99] *Id.* at 657.

[100] *Commonwealth v. Caetano*, 26 N.E.3d 688, 692-94 (Mass. 2015).

[101] 577 U.S. 411, 412 (2016).

[102] *Id.* at 412; *see id.* at 411-12 (swiftly rejecting each of the state court's three rationales for its holding, which were that (1) stun guns "were not in common use at the time of the Second Amendment's enactment," (2) stun guns are "unusual" because they are "a thoroughly modern invention," and (3) stun guns are not "readily adaptable to use in the military" (cleaned up)).

In particular, several federal circuits devised "a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny."[103] That approach was "policy by another name," and it "eviscerate[d] many of the protections recognized in *Heller* and *McDonald*."[104] In the Ninth Circuit, for example, the government at one point enjoyed an "'undefeated, 50–0 record'" against Second Amendment challenges.[105]

Meanwhile, a number of Supreme Court justices raised the alarm:

- Justice Thomas (joined by Justice Scalia) lamented that "[d]espite the clarity with which we described the Second Amendment's core protection for the right of self-defense, lower courts . . . have failed to protect it."[106]

- Justice Thomas (again joined by Justice Scalia) criticized lower courts' "crabbed reading of *Heller*" and

---

[103] *Bruen*, 142 S. Ct. at 2125; *see id.* at 2125-27 & n.4 (citing cases).

[104] First quoting *Rahimi*, slip op. at 18 (Kavanaugh, J., concurring); then quoting *Friedman v. City of Highland Park*, 577 U.S. 1039, 1041 (2015) (*Friedman II*) (Thomas, J., dissenting from denial of certiorari). Because I later refer to the Seventh Circuit opinion with the same caption, I will cite this one as *Friedman II*.

[105] *Rahimi*, slip op. at 5 (Gorsuch, J., concurring) (quoting *Duncan II*, 19 F.4th at 1167 n.8 (VanDyke, J., dissenting)); *see also Bruen*, 142 S. Ct. at 2131 ("If the last decade of Second Amendment litigation has taught this Court anything, it is that federal courts tasked with making such difficult empirical judgments regarding firearm regulations under the banner of 'intermediate scrutiny' often defer to the determinations of legislatures.").

[106] *Jackson v. City and County of San Francisco*, 135 S. Ct. 2799, 2799 (2015) (Thomas, J., dissenting from denial of certiorari).

"noncompliance with our Second Amendment precedents."[107]

- Justice Thomas said that "lower courts are resisting this Court's decisions in *Heller* and *McDonald* and are failing to protect the Second Amendment to the same extent that they protect other constitutional rights."[108]

- Justice Alito (joined by Justice Thomas) criticized lower-court "reasoning" that "defies our decision in *Heller*."[109]

- Justice Alito (joined by Justice Gorsuch) expressed "concern" about "the way *Heller* has been treated in the lower courts."[110]

- Justice Kavanaugh shared a similar "concern that some federal and state courts may not be properly applying *Heller* and *McDonald*."[111]

- Justice Thomas (joined by Justice Kavanaugh) again accused the lower courts of "blatant defiance," explaining that means-end scrutiny was "entirely inconsistent with *Heller*" and "appear[ed] to be entirely made up."[112]

These five justices did not chastise lower courts only for ignoring *Heller*'s holding that history and tradition alone

---

[107] *Friedman II*, 577 U.S. at 1039, 1041 (Thomas, J., dissenting from denial of certiorari).

[108] *Silvester*, 138 S. Ct. at 950 (Thomas, J., dissenting from denial of certiorari).

[109] *Caetano*, 577 U.S. at 414 (Alito, J., concurring in the judgment).

[110] *New York State Rifle & Pistol Association v. City of New York*, 140 S. Ct. 1525, 1544 (2020) (Alito, J., dissenting).

[111] *Id.* at 1527 (Kavanaugh, J., concurring).

[112] *Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (Thomas, J., dissenting from denial of certiorari).

determine exceptions to the Second Amendment's textual baseline. They also chided lower courts for ignoring *Heller*'s more specific holding — that there is no historical tradition of categorical bans on arms "in common use" for lawful purposes.[113]

Consider, for example, *Friedman v. City of Highland Park*.[114] The Court declined to take up a challenge to a city ban on "many of the most commonly owned" semiautomatic rifles and the plus-ten magazines commonly used with them.[115] Justice Thomas dissented from the denial of certiorari, joined by Justice Scalia. He explained that *Heller* and *McDonald* do not allow "categorical bans on firearms that millions of Americans commonly own for lawful purposes,"[116] repeatedly underscoring *Heller*'s third holding about arms in common use:

- "*Heller* asks whether the law bans types of firearms commonly used for a lawful purpose — regardless of whether alternatives exist."[117]

- "*Heller* draws a distinction between such firearms [in common use for a lawful purpose] and weapons specially adapted to unlawful uses and not in common use, such as sawed-off shotguns."[118]

---

[113] *Heller*, 554 U.S. at 627.

[114] 577 U.S. 1039, 1039 (2015) (Thomas, J., dissenting from denial of certiorari).

[115] *Id.* at 1039 (Thomas, J., dissenting from denial of certiorari).

[116] *Id.* (Thomas, J., dissenting from denial of certiorari).

[117] *Id.* at 1042 (Thomas, J., dissenting from denial of certiorari).

[118] *Id.* (Thomas, J., dissenting from denial of certiorari).

- *Heller* and *McDonald* "excluded from [Second Amendment] protection only those weapons not typically possessed by law-abiding citizens for lawful purposes."[119]

- "Roughly 5 million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons."[120]

Consider also *Caetano*, the stun-gun case in which the unanimous Supreme Court summarily reversed the Massachusetts Supreme Judicial Court. There, Justice Alito (joined by Justice Thomas) wrote separately to emphasize *Heller*'s third holding about arms in common use:

- "[T]he pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today."[121]

- "A weapon may not be banned unless it is *both* dangerous *and* unusual."[122]

---

[119] *Id.* at 1040 (Thomas, J., dissenting from denial of certiorari) (cleaned up).

[120] *Id.* at 1042 (Thomas, J., dissenting from denial of certiorari) (emphasis added).

[121] *Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) (emphasis omitted).

[122] *Id.* at 417 (Alito, J., concurring in the judgment).

- "[T]he relative dangerousness of a weapon is *irrelevant* when the weapon belongs to a class of arms commonly used for lawful purposes."[123]

- "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons *therefore* violates the Second Amendment."[124]

Supreme Court justices were not alone in objecting to lower courts' "eviscerat[ion]" of *Heller* and *McDonald*.[125] "A chorus" of district judges and dissenting circuit judges echoed them.[126] One was then-Judge Kavanaugh.

---

[123] *Id.* at 418 (Alito, J., concurring in the judgment) (emphasis added).

[124] *Id.* at 420 (Alito, J., concurring in the judgment) (emphasis added); *see id.* (Alito, J., concurring in the judgment) (noting "that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States" (cleaned up)).

[125] *Friedman II*, 577 U.S. at 1041 (Thomas, J., dissenting from denial of certiorari).

[126] *Duncan II*, 19 F.4th at 1147 (Bumatay, J., dissenting, joined by Ikuta and Nelson, JJ.) (citing *Mai v. United States*, 974 F.3d 1082, 1083 (9th Cir. 2020) (Collins, J., dissenting from the denial of reh'g en banc)); *id.* at 1097 (VanDyke, J., dissenting from the denial of reh'g en banc); *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106, 126 (3d Cir. 2018) (Bibas, J. dissenting); *Mance v. Sessions*, 896 F.3d 390, 394 (5th Cir. 2018) (Elrod, J., joined by Jones, Smith, Willett, Ho, Duncan, and Engelhardt, JJ., dissenting from the denial of reh'g en banc); *Tyler v. Hillsdale Cnty. Sheriff's Department*, 837 F.3d 678, 702 (6th Cir. 2016) (Batchelder, J., concurring in most of the judgment); *id.* at 710 (Sutton, J., concurring in most of the judgment)).

Dissenting in *Heller II*, Judge Kavanaugh urged this court to apply *Heller I*'s second and third holdings. He said, "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."[127] And he added, "In *Heller*, the Supreme Court held that handguns . . . are constitutionally protected *because* they have not traditionally been banned and are in common use by law-abiding citizens."[128]

### 6. *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022)

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, the Supreme Court vindicated the chorus of circuit-court dissenters, repudiated "means-end" scrutiny (again), and (again) reaffirmed *Heller*'s second holding that "when the Second Amendment's plain text covers an individual's conduct," exceptions to that right must be "consistent with this Nation's historical tradition of firearm regulation."[129]

---

[127] *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting); *see also id.* at 1272 (Kavanaugh, J., dissenting) ("The scope of the right is thus determined by 'historical justifications.'" (quoting *Heller,* 554 U.S. at 635)).

[128] *Id.* at 1269 (Kavanaugh, J., dissenting) (emphasis added); *see also id.* at 1288 (Kavanaugh, J., dissenting) ("the government may not generally ban semi-automatic guns" because "semi-automatic weapons 'traditionally have been widely accepted as lawful possessions'" (quoting *Staples*, 511 U.S. at 612)).

[129] 142 S. Ct. 2111, 2126-27 (2022); *see also id.* at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); *id.* at 2128 (*Heller* "assessed the lawfulness of that handgun ban by scrutinizing whether it comported with history and tradition").

At the same time, *Bruen* gave lower courts additional guidance about how to apply *Heller*'s history-and-tradition test. As in other constitutional contexts, the burden is on the government to justify regulations that are "presumptively protect[ed]."[130] And the government satisfies that burden only if it can "identify a well-established and representative historical analogue" within our country's historical tradition.[131]

*Bruen* applied that history-and-tradition test to a New York law that conditioned licenses to carry handguns "on a citizen's showing of" a "special need for self-defense."[132] *Bruen* needed to conduct its own historical inquiry "because . . . *Bruen* did not involve an arms ban" and so "could not be resolved by applying *Heller*'s rule" that the government cannot ban arms in common use for lawful purposes.[133] The Court considered the history and held that New York's law was not "consistent with the Second Amendment's text and historical understanding."[134]

In addition, *Bruen* reaffirmed *Heller*'s third holding — that, in view of our nation's history and tradition, the government cannot categorically ban a class of arms in common use for lawful purposes: "[*Heller*] found it 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons' that the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"[135] *Heller*'s "historical

---

[130] *Id.* at 2129-30.

[131] *Id.* at 2133 (emphasis omitted).

[132] *Id.* at 2122.

[133] Smith, *How Courts Have Defied* Heller, at 11 (emphasis omitted).

[134] *Bruen*, 142 S. Ct. at 2131.

[135] *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627 (cleaned up)).

analysis sufficed to show that the Second Amendment did not countenance a complete prohibition on the use of the most popular weapon chosen by Americans for self-defense in the home."[136]

So in summary, *Bruen*:

- Confirmed *Heller*'s second holding, which established the history-and-tradition test;

- Described how to apply *Heller*'s history-and-tradition test to types of gun regulations that the Supreme Court has not *already* considered;

- Held that there is no historical tradition analogous to New York's public-carry regulation — which was a time-place-manner regulation, not a categorical ban controlled by *Heller*'s third holding that the government cannot ban arms "in common use" for lawful purposes; and

- Reaffirmed that third holding of *Heller*.

### 7. *United States v. Rahimi* (2024)

Just two years after *Bruen*, the Supreme Court returned to the Second Amendment in *United States v. Rahimi*.[137] It reviewed a federal statute that "prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he 'represents a

---

[136] *Id.* (cleaned up).

[137] No. 22-915, 602 U.S. ___, slip op. (June 21, 2024).

credible threat to the physical safety of an intimate partner,' or a child of the partner or individual."[138]

In *Rahimi*, the government proposed two traditional types of laws to show that "the new law is relevantly similar to laws that our tradition is understood to permit."[139] Because those old laws (1) imposed burdens like the new law's burdens for reasons like the new law's reasons, (2) were widespread, and (3) were old enough to help illuminate the Second Amendment's original meaning, the Court upheld the new law. It held that the nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."[140]

In so doing, *Rahimi* "carefully buil[t] on *Heller*, *McDonald*, and *Bruen*."[141] It reiterated the history-and-tradition test already well established under *Heller*, *McDonald*, and *Bruen*, while also reaffirming their distinction between arms in common use versus "'dangerous and unusual weapons.'"[142] In addition, its multiple opinions elaborated on the standard for using analogical reasoning to determine whether a modern law falls within a historical tradition.

## 8. Takeaways from the Supreme Court's Precedents

Where do all these cases leave us? For starters, *Heller*'s four holdings remain undisturbed: There is an individual (though not unlimited) right to possess and carry arms.

---

[138] *Id.* at 1 (quoting 18 U.S.C. § 922(g)(8) (cleaned up)).

[139] *Id.* at 23 (Kavanaugh, J., concurring) (cleaned up).

[140] *Id.* at 16 (majority).

[141] *Id.* at 23 (Kavanaugh, J., concurring).

[142] *Id.* at 6 (majority) (quoting *Heller*, 554 U.S. at 627).

Exceptions to that right depend on history and tradition. There is no history and tradition of banning arms in common use for lawful purposes. D.C. cannot categorically ban handguns because they are in common use.

To *Heller*'s final and most specific holding, we can add the most specific holdings of *McDonald*, *Bruen*, and *Rahimi*. Like the federal government and federal enclaves, states too cannot categorically ban handguns because they are in common use for lawful purposes — *McDonald*.[143] The government also cannot impose an unusually restrictive licensing regime like New York's because it is inconsistent with the nation's historical tradition — *Bruen*.[144] In contrast, the government can temporarily disarm people who present a credible threat of violence because that type of law is consistent with the nation's historical tradition — *Rahimi*.[145]

None of those holdings should cause unusual "difficulty" for "judges on the ground."[146] For example, in cases about banning arms in common use, *Heller* and its progeny require no "mad scramble for historical records"[147] because they have "already done the work and provided the test that [we] must

---

[143] *McDonald*, 561 U.S. at 749-50.

[144] *Bruen*, 142 S. Ct. at 2156.

[145] *Rahimi*, slip op. at 5.

[146] *Id.* at 1 (Jackson, J., concurring); *see also id.* at 2 (Jackson, J., concurring) ("The message that lower courts are sending now in Second Amendment cases could not be clearer. They say there is little method to *Bruen*'s madness."); *id.* (citing many lower-court judges' complaints about the Supreme Court's jurisprudence).

[147] *Id.* at 5 n.3 (Jackson, J., concurring).

apply."[148]  And when we fail to apply their rule, "the blame" lies "with us, not with them."[149]

As for gun laws *other than* complete bans on arms in common use for lawful purposes (*Heller*), unusually restrictive licensing regimes (*Bruen*), and temporary disarmaments of specific people who credibly threaten violence (*Rahimi*), the government can defend laws regulating conduct covered by the Second Amendment's plain text only by identifying an appropriate analogue from our nation's historical tradition.[150] Three considerations must inform that "analogical reasoning under the Second Amendment."[151]

*First*, "[w]hy and how the regulation burdens the right are central to this inquiry."[152]  The government must identify traditional laws that had a similar justification *and* imposed a similar burden when compared to the challenged modern law. "[I]f earlier generations addressed the [same] societal problem, but did so through materially different means, that . . . could be evidence that a modern regulation is unconstitutional."[153] (Spoiler alert: This is a problem for the majority's two analogues.)

*Second*, to establish a historical tradition, the government needs analogues that represent the "collective understanding of Americans."[154]  So outliers don't count.  That's why *Bruen*

---

[148] Smith, *How Courts Have Defied* Heller, at 10.

[149] *Rahimi*, slip op. at 1 (Jackson, J., concurring).

[150] *See Bruen*, 142 S. Ct. at 2133.

[151] *Id.*; *see also Rahimi*, slip op. at 7-8.

[152] *Rahimi*, slip op. at 7; *see also Bruen*, 142 S. Ct. at 2132-33.

[153] *Bruen*, 142 S. Ct. at 2131.

[154] *Rahimi*, slip op. at 11 (Kavanaugh, J., concurring).

dismissed "three colonial regulations" and "a few late-19th-century outlier jurisdictions."[155]  And it's why *Heller* "would not stake" its "interpretation of the Second Amendment upon a single law, in effect in a single city, that contradicts the overwhelming weight of other evidence."[156]  (Spoiler alert: This is a problem for the majority's state-law analogue.)

*Third*, "when it comes to interpreting the Constitution, not all history is created equal."[157]  The "Second Amendment 'codified a *pre-existing* right' belonging to the American people, one that carries the same 'scope' today that it was 'understood to have when the people adopted' it."[158]  So its scope "is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."[159]

That means "the history that matters most is the history surrounding the ratification of the text."[160]  For the Second Amendment, the Founding Era matters more than the half-century that followed it, which matters more than the late-nineteenth and early-twentieth centuries, which matter more than the late-twentieth and twenty-first centuries, which do not

---

[155] *Bruen*, 142 S. Ct. at 2142 (emphasis omitted); *id.* at 2156; *see also id.* at 2153 ("while we recognize the support that postbellum Texas provides for [the government's] view, we will not give disproportionate weight to a single state statute and a pair of state-court decisions"); *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1218 (7th Cir. 2023) (Brennan, J., dissenting) ("three analogues were not enough in *Bruen*").

[156] *Heller*, 554 U.S. at 632.

[157] *Bruen*, 142 S. Ct. at 2136.

[158] *Rahimi*, slip op. at 2 (Gorsuch, J., concurring) (quoting *Heller*, 554 U.S. at 592).

[159] *Bruen*, 142 S. Ct. at 2137.

[160] *Rahimi*, slip op. at 2 (Barrett, J., concurring).

matter much at all. (Spoiler alert: This too is a problem for the majority.)

To be sure, "post-ratification history" can "be important," especially when it's close in time to the Founding, the constitutional text is vague, the Founding-Era history is inconclusive, the post-Founding tradition is well-established, and judicial precedents give no guidance.[161] Put differently, post-ratification history matters when the only alternative is policymaking from the bench.[162] But "evidence of tradition unmoored from original meaning is not binding law. And scattered cases or regulations pulled from history may have little bearing on the meaning of the text."[163]

*Heller* is, as ever, instructive. There, the Founding-Era history mattered the most. The Court said that if discussions "took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources."[164] That's why "*Heller*'s interest in mid- to late-19th-century commentary was secondary."[165] *Heller*'s "19th-century evidence was treated as

---

[161] *Id.* at 10-11 (Kavanaugh, J., concurring).

[162] *See id.* at 10 (Kavanaugh, J., concurring) ("there can be little else to guide a judge deciding a constitutional case in that situation, unless the judge simply defaults to his or her own policy preferences").

[163] *Id.* at 2-3 (Barrett, J., concurring) (cleaned up); *see also Bruen*, 142 S. Ct. at 2137 ("to the extent later history contradicts what the text says, the text controls"); *id.* ("'post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text'" (quoting *Heller II*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting))).

[164] *Heller,* 554 U.S. at 614.

[165] *Bruen*, 142 S. Ct. at 2137.

mere confirmation of what the Court thought had already been established,"[166] and it refused to give that "postenactment history more weight than it can rightly bear."[167]

So to sum up the history-and-tradition test, a historical analogue need not be a "dead ringer" or "historical twin."[168] But analogues are strongest when (1) they burden gun rights for a similar reason *and* in a similar way as the challenged modern law; *and* (2) they represent the nation's collective understanding; *and* (3) they were enacted in an instructive historical period, preferably around the Second Amendment's ratification in 1791. In *Rahimi*, the government won when it hit that trifecta. In *Heller*, *McDonald*, and *Bruen*, the government lost when it could not.

## III. D.C.'s Ban on Plus-Ten Magazines Is Unconstitutional

D.C.'s ban on commonly used plus-ten magazines conflicts with *Heller*'s holding that the government cannot ban an arm in common use for lawful purposes. That alone decides this case.

In addition, D.C. has failed to show that its ban is consistent with the nation's historical tradition — even

---

[166] *Id.* (cleaned up).

[167] *Id.* at 2136; *see also id.* at 2131 ("after considering '*founding-era* historical precedent,' including 'various restrictive laws in the colonial period,' and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional" (emphasis added) (quoting *Heller,* 554 U.S. at 631)); *Duncan II*, 19 F.4th at 1158 (Bumatay, J., dissenting) ("Prohibition-era laws of Michigan, Rhode Island, and Ohio . . . aren't nearly old enough to be longstanding").

[168] *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).

assuming *Heller* left it an open question. That too is a sufficient reason to hold that D.C.'s ban is unconstitutional.[169]

## A. Applying *Heller*'s Common-Use Test to D.C.'s Ban on Plus-Ten Magazines

The majority presumes that plus-ten magazines are arms in common use by law-abiding citizens for the lawful purpose of self-defense.[170] On that, we agree.[171]

---

[169] When I say D.C.'s ban is unconstitutional, I mean it is unconstitutional as applied to magazines that hold up to 17 rounds. Those are the only magazines at issue in this appeal, which concerns the plaintiffs' as-applied challenge. *See* Majority Op. at 7 n.2. We are not asked to decide whether there is a right to magazines that hold more than 17 rounds. *Cf. Heller II*, 670 F.3d at 1261 ("There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten.").

[170] Majority Op. at 11.

[171] The majority uses the formulation "in common use *for self-defense*," *see, e.g.*, *id.* (emphasis added), whereas I use the formulation "in common use for lawful purposes," *cf. Bianchi*, slip op. at 87-88 (Richardson, J., dissenting) ("the tradition of prohibiting dangerous and unusual weapons . . . does not support a complete ban on the possession of weapons that are commonly used for *lawful purposes*" (emphasis added)); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 415 (7th Cir. 2015) (*Friedman I*) (Manion, J., dissenting) ("The 'common use' test . . . asks whether a particular weapon is commonly used by law-abiding citizens *for lawful purposes*." (emphasis added)). For today's case, the difference doesn't matter because the majority presumes that plus-ten magazines are in common use by law-abiding citizens for "self-defense," which is a "lawful purpose."

That should not be a close question. Americans have in their hands and homes an estimated 100 million plus-ten magazines.[172] They likely account for about half of all

---

Because the distinction may matter in future cases, I offer a quick note on why it seems to me that the "lawful purposes" formulation is more faithful to the Supreme Court's precedents.

The Supreme Court has often noted other lawful purposes for keeping and bearing arms, in addition to self-defense. *Heller,* 554 U.S. at 599 ("preserving the militia was [not] the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense *and hunting*" (emphasis added)); *id.* at 636-37 (Stevens, J., dissenting) (framing the question in *Heller* as "[w]hether [the Second Amendment] . . . protects the right to possess and use guns for [lawful] nonmilitary purposes like hunting and personal self-defense"); *see also id.* at 620 (majority) (noting that the Court had previously "described the right protected by the Second Amendment as bearing arms for a lawful purpose" (cleaned up)). Though the Court has also often mentioned self-defense, that's because self-defense is the primary "lawful purpose" for which Americans keep and bear arms. *See id.* at 630 (self-defense is handguns' "core lawful purpose"); *id.* at 624 (using the phrase "for lawful purposes *like* self-defense" (emphasis added)); *McDonald*, 561 U.S. at 780 (plurality) (stating that the "central holding in *Heller*" was "that the Second Amendment protects a personal right to keep and bear arms *for lawful purposes, most notably for self-defense within the home*" (emphasis added)); *cf. Bianchi*, slip op. at 175-76 (Richardson, J., dissenting) (cautioning against a framework that "allows judges to decide just how important they think certain firearms are for self-defense and then to weigh th[at] finding against the threat they believe those arms pose to the public at large").

[172] *See Duncan II*, 19 F.4th at 1155 (Bumatay, J., dissenting); *see also* William English, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned, SSRN, at 20, 24 (May 13, 2022), https://perma.cc/PXN2-T3XG ("English Report") (estimating that Americans have, over time, owned more than *500 million* plus-ten magazines, including 269 million for handguns).

magazines in circulation,[173] and nearly half of gun owners have owned them.[174] These magazines "come standard" with many of the nation's most popular firearms, including "[m]illions of semiautomatic pistols, the 'quintessential self-defense weapon' for the American people."[175]

I could say more.[176] But if plus-ten magazines are (1) half of America's magazines, (2) owned by half of America's gun owners, and (3) often standard on Americans' preferred weapon for self-defense, what else needs to be said? That is (more than) enough to show common use for lawful purposes.

---

[173] *See Duncan II*, 19 F.4th at 1155 (Bumatay, J., dissenting); *id.* at 1097 (majority) ("experts estimate that approximately half of all privately owned magazines in the United States have a capacity greater than ten rounds").

[174] *See* English Report at 1-2, 20.

[175] *Duncan II*, 19 F.4th at 1155 (Bumatay, J., dissenting) (quoting *Heller,* 554 U.S. at 629); *see also Duncan I*, 970 F.3d at 1142 ("several variants of the Glock pistol — dubbed 'America's gun' due to its popularity — come standard with a seventeen-round magazine"); *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) ("Most pistols are manufactured with magazines holding ten to seventeen rounds . . . ."), *abrogated by Bruen*, 142 S. Ct. 2111, 2125-27 (2022); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 874 (2015) ("It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms.").

[176] Plus-ten magazines also have "a long historical lineage." *Duncan II*, 19 F.4th at 1140 (Bumatay, J., dissenting). "They enjoyed widespread use throughout the nineteenth and twentieth centuries," with "no longstanding prohibitions against them." *Id.* (Bumatay, J., dissenting).

In the context of a complete ban on a category of arms, "that is *all that is needed* for citizens to have a right under the Second Amendment to keep such weapons."[177]  *Heller* held that because handguns are "in common use," D.C.'s "complete prohibition of their use is invalid."[178]  For the same reason, D.C.'s ban on plus-ten magazines is unconstitutional.[179]

---

[177] *Friedman II*, 577 U.S. at 1042 (Thomas, J., dissenting from denial of certiorari) (emphasis added).

[178] *Heller,* 554 U.S. at 624, 629; *see also supra* Part II.B.3.

[179] *See, e.g.*, *Duncan II*, 19 F.4th at 1140 (Bumatay, J., dissenting) ("The state bans . . . [plus-ten] magazines [that] are lawfully owned by millions of people nationwide and come standard on the most popular firearms sold today. . . .  But the Constitution protects the right of law-abiding citizens to keep and bear arms typically possessed for lawful purposes."); *Duncan I*, 970 F.3d at 1169 ("California's near-categorical ban of [plus-ten magazines] . . . criminalizes the possession of half of all magazines in America today.  It makes unlawful magazines that are commonly used in handguns by law-abiding citizens for self-defense.  And it substantially burdens the core right of self-defense guaranteed to the people under the Second Amendment."); *New Jersey Rifle & Pistol Clubs*, 910 F.3d at 126-27, 130 (Bibas, J., dissenting) ("I would enjoin this Act until New Jersey provides real evidence to satisfy its burden of proving the Act constitutional. . . .  People commonly possess large magazines to defend themselves and their families in their homes.  That is *exactly why* banning them burdens the core Second Amendment right."); *cf. Bianchi*, slip op. at 152-53 (Richardson, J., dissenting) (The "evidence shows that millions of Americans have chosen to equip themselves with semiautomatic rifles, like the AR-15, for various lawful purposes.  So Appellees have failed to prove that these weapons are 'unusual' such that they can be constitutionally outlawed.  Maryland's ban therefore violates the Second Amendment.").

In other words:

**Major Premise (explained at length above):**

*Heller* held that the government cannot ban arms in common use for lawful purposes.

**Minor Premise (undisputed by the majority):**

Plus-ten magazines are arms in common use for lawful purposes.

**Conclusion:**

The government cannot ban plus-ten magazines.[180]

---

[180] Before discussing in the next section my disagreement with the majority, I digress here to note two areas where the majority and I share common ground.

First, I agree with the majority's decision to presume that it doesn't matter whether plus-ten magazines "are rarely used to fire more than a couple rounds in self-defense." Majority Op. at 11. A handgun may be "used" without firing it, and a magazine may be "used" without dispensing a single round (let alone depleting its capacity). *See Heller,* 554 U.S. at 629, 636 (recognizing that handguns are commonly "*used* for self-defense" (emphasis added)); English Report at 14 (noting that "in the vast majority of defensive gun uses (81.9%), the gun was not fired"). What matters, again, is that millions of law-abiding Americans have chosen to arm themselves with plus-ten magazines to use for a lawful purpose. *Id.* at 26-33 (survey responses commenting on the utility of plus-ten magazines in self-defense situations); *id.* at 23 (62.4% of 39 million plus-ten magazine owners — about 24 million — own them for home defense). In any event, Americans *do* often fire more than ten rounds at the shooting range, and target practice is a perfectly lawful, common use. *See id.*

41

## B. Regarding the Majority

To repeat, I read *Heller* and its progeny to have *already* held that the government cannot ban an arm in common use for lawful purposes. But I also respect the good faith with which my fellow panel members have concluded otherwise. In their view, the validity of every ban on arms in common use is its own open question, so D.C. deserves the chance to show its ban "is consistent with this Nation's historical tradition of firearm regulation."[181]

Even if that is in fact an open question, D.C. has identified no "historical tradition" of *any* ban on an arm in common use for lawful purposes. Neither has the majority. Instead, the

Second, though the majority says I argue that "any restriction" of arms in common use is unconstitutional, that is not my position. *See* Majority Op. at 12 ("Hanson would have us stop here, as would our dissenting colleague, arguing that, under *Bruen*, to find an arm is in common use renders any restriction of that arm unconstitutional."). I agree with the majority that some regulations of arms in common use are constitutional — including some regulations of plus-ten magazines. But that's because some regulations are not outright bans. Regulations of arms in common use — other than outright bans — are constitutional if they are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. *Heller* lists some regulations — other than outright bans — that are likely consistent with our nation's history and tradition of firearms regulation: "prohibitions on carrying concealed" arms in common use; prohibitions on the possession of arms in common use "by felons and the mentally ill"; "forbidding the carrying of" arms in common use "in sensitive places such as schools and government buildings"; and "laws imposing conditions and qualifications on the commercial sale of arms" in common use. *Heller,* 554 U.S. at 626-27 & n.26.

[181] *Bruen*, 142 S. Ct. at 2126.

majority invents a regulatory category — "restrictions on . . . weapons particularly capable of unprecedented lethality."[182] Then it says such restrictions are consistent with two historical analogues.[183]

I agree with the majority that the history-and-tradition test allows for historical analogues less specific than, say, bans on plus-ten magazines. After all, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."[184] But the history-and-tradition test demands a level of generality more specific than the majority's preferred category of "restrictions on weapons particularly capable of unprecedented lethality."[185]

*Heller* never mentioned that category — even though the Court was told that the handguns at issue there "are used in an extraordinary percentage of this country's well-publicized shootings, including the large majority of mass shootings."[186] Instead, *Heller* set the level of generality for bannable arms at "dangerous *and* unusual" arms — i.e., arms not "in common use" for lawful purposes.[187] So did the Supreme Court's

---

[182] Majority Op. at 18.

[183] *See id.* at 18-25.

[184] *See Rahimi*, slip op. at 7.

[185] *See* Majority Op. at 18; *see also id.* at 13 (considering "an unbroken tradition of regulating weapons to protect communities" (cleaned up) to be "the pinnacle of abstraction" and representative of a "regulatory blank check").

[186] *See* Br. of Violence Policy Center et al. as Amici Curiae Supporting Petitioners at 24, *Heller,* 554 U.S. 570 (No. 07-290), 2008 WL 136348; *see also* Smith, *How Courts Have Defied* Heller, at 7-8.

[187] *Heller,* 554 U.S. at 627 (emphasis added) (cleaned up).

subsequent cases.[188]   They confirm that "the relative dangerousness of a weapon is *irrelevant* when the weapon belongs to a class of arms commonly used for lawful purposes."[189]

As for the two historical analogues proposed by the majority, they do not show a historical tradition of laws like D.C.'s ban of plus-ten magazines.  The majority first points to a "handful" of outlier state and territorial laws from the second half of the nineteenth century that restricted the open carry of Bowie knives.[190]   The majority's second analogue — the National Firearms Act of 1934 — regulated only "unusual" weapons like fully automatic machine guns, not arms "in common use" like the plus-ten magazines that D.C. has banned.[191]

### 1. Outlier State and Territory Bowie-Knife Regulation (1871-1889)

In the 1870s and '80s, two states (Texas and Arkansas) and a federal territory (Arizona) prohibited the open carry of Bowie

---

[188] *See supra* Part II.B.4, 6-7.

[189] *Caetano*, 577 U.S. at 418 (Alito, J., concurring in the judgment) (emphasis added).

[190] *See* Majority Op. at 19-20.

[191] *See id.* at 22-24.

knives.[192]  For the sake of argument, let's suppose that Bowie knives were arms in common use for lawful purposes.[193]

Even then, these three laws did not impose the "burden" on arms that D.C.'s total ban imposes because none of these laws banned Bowie knives from the home.[194]  Plus, two expressly permitted keeping Bowie knives at one's "place of business," and all of these laws allowed travelers to carry Bowie knives.[195]  In contrast, D.C.'s plus-ten magazine ban

---

[192] An Act to Regulate the Keeping and Bearing of Deadly Weapons, 1871 Tex. Gen. Laws 25, ch. 34, § 1 (prohibiting "any person" from "carrying [a Bowie knife] on or about his person, saddle, or in his saddle bags"); An Act to Preserve the Public Peace and Prevent Crime, 1881 Ark. Acts 191, no. 96, § 1 (crime to "wear or carry" Bowie knives "in any manner"); An Act Defining and Punishing Certain Offenses Against the Public Peace, 1889 Ariz. Sess. Laws 30, no. 13, § 1 (no person may "carry [a Bowie knife] on or about his person, saddle, or in his saddle bags"); *see* Majority Op. at 19-20 (citing these three laws as "ban[ning] the carrying, rather than only the concealment, of Bowie knives"); An Act to Provide a Temporary Government for the Territory of Arizona, Pub. L. No. 37-56, ch. 56, § 1, 12 Stat. 664, 665 (1863) (creating the "temporary" Arizona territory government that enacted the Bowie-knife law).

[193] *But see* Majority Op. at 20 ("those weapons . . . are usually employed in private broils, and . . . are efficient only in the hands of the robber and the assassin" (quoting *Aymette v. State*, 21 Tenn. 154, 158 (1840))).

[194] *Bruen*, 142 S. Ct. at 2133.

[195] *See* 1871 Tex. Gen. Laws 25, § 1 ("*provided*, that this section shall not be so construed as to prohibit any person from keeping or bearing arms *on his or her own premises, or at his or her own place of business*, . . . nor to prohibit persons *traveling* in the State from keeping or carrying arms with their baggage" (second and third emphasis added)); 1881 Ark. Acts 191, § 1 ("*Provided, further*, That nothing in this act be so construed as to prohibit any person from

applies in the home and everywhere else. For that reason alone, the three laws are not analogous to D.C.'s.

In addition, three laws passed nearly a century after the Second Amendment's ratification (plus a couple of state court decisions)[196] hardly constitute a "representative historical analogue"[197] that reflects the "collective understanding of Americans."[198] *Heller* refused to "stake" its "interpretation of the Second Amendment upon a single law, in effect in a single city."[199] *Bruen* refused to "give disproportionate weight to a single state statute" — or even to "three."[200]

---

carrying any weapon *when upon a journey, or upon his own premises*." (second emphasis added)); 1889 Ariz. Sess. Laws 30, Act No. 13, § 2 ("The preceding article shall not apply to . . . the carrying of arms *on ones* [sic] *own premises or place of business*, nor to persons *traveling* . . . ." (emphases added)).

[196] *See* Majority Op. at 19-21.

[197] *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).

[198] *Rahimi*, slip op. at 11 (Kavanaugh, J., concurring).

[199] *Heller,* 554 U.S. at 632.

[200] *Bruen*, 142 S. Ct. at 2153, 2156.

By the way, neither of the state court decisions quoted by the majority addressed *bans* on Bowie knives. *See Cockrum v. State*, 24 Tex. 394, 401 (1859) (law enhancing the penalty for manslaughter committed with Bowie knife); *Aymette*, 21 Tenn. at 156 (law prohibiting concealed carry of Bowie knives). And in fact, both courts conspicuously affirmed the right to possess Bowie knives. *See Cockrum*, 24 Tex. at 403 ("The right to carry a bowie-knife for lawful defense is secured, and must be admitted."); *Aymette*, 21 Tenn. at 160 (noting that "citizens have the unqualified right to *keep* the weapon," while explaining that "the right to *bear arms* is not of that unqualified character" (emphases original)); *see also Bianchi*, slip op. at 140-41 (Richardson, J., dissenting) (*Aymette* and similar state cases "determined whether the regulated weapon was in common use

Three statutes from the late 1800s are not only too little — they're also too late.  Recall that "*Heller*'s interest in mid- to late-19th-century commentary was secondary."[201] Likewise, in *Bruen*, "post-Civil War discussions of the right" did "not provide as much insight into its original meaning as earlier sources" in part because they occurred "75 years after the ratification of the Second Amendment."[202]  So even if the majority's "handful" of states had gone *further* and completely banned Bowie knives in the late 1800s, "scattered cases or regulations pulled from history may have little bearing on the meaning of the text" of the Second Amendment.[203]

---

for lawful purposes.  If it was, then they held that the government could regulate the possession or carry of that weapon, but that it could not completely ban it.  Yet if that weapon was not in common use for lawful purposes, and if the weapon was particularly useful for criminal activity, then the government could outlaw it.").

[201] *Bruen*, 142 S. Ct. at 2137.

[202] *Id.* (cleaned up).

[203] *Rahimi*, slip op. at 2-3 (Barrett, J., concurring).

*Bruen* left open the question of whether the right to keep and bear arms, as applied against the states through the Fourteenth Amendment, should be interpreted as it was understood in 1791, when the Second Amendment was ratified, or in 1868, when the Fourteenth Amendment was ratified.  *See* 142 S. Ct. at 2138.  I take no position on that debate, or on mid- to late-19th-century regulations' relevance to analysis of modern laws enacted by a state, rather than by the federal government or a federal enclave like D.C.  Here, because the Second Amendment applies directly to D.C., the original meaning that controls is undoubtedly the original meaning in 1791.

## 2. The National Firearms Act
## (1934)

As for the National Firearms Act of 1934, it regulated only "*unusual*" weapons like fully automatic machine guns and sawed-off shotguns, which were "not typically possessed by law-abiding citizens for lawful purposes."[204] And to know that, you don't need to look beyond the United States Reports. The Supreme Court "stated in *Staples* and again in *Heller*" that "short-barreled shotguns and automatic 'M-16 rifles and the like' are *not* in common use."[205]

Therefore, even if the 1934 Act is representative of our historical tradition of firearm regulation,[206] it is not "relevantly similar" to D.C.'s ban on plus-ten magazines.[207] Unlike D.C.'s ban, the 1934 Act did not regulate arms "in common use," so it did not "impose a comparable burden" on the right to keep and bear arms.[208] In fact, the 1934 Act might be affirmative evidence *against* D.C. — *Bruen* said an old regulation "could be evidence that a modern regulation is unconstitutional" if

---

[204] *Heller,* 554 U.S. at 623, 625, 627 (emphasis added); *see also Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) (fully automatic machine guns "were developed for the battlefield and were *never in widespread civilian use* in the United States" (emphasis added)).

[205] *Heller II*, 670 F.3d at 1288 (Kavanaugh, J., dissenting) (emphasis added) (quoting *Heller,* 554 U.S. at 627, and citing *Staples*, 511 U.S. at 611-12).

[206] *See Heller,* 554 U.S. at 624 (considering it "startling" to think "that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional").

[207] *Bruen*, 142 S. Ct. at 2132 (cleaned up).

[208] *Id.* at 2133.

"earlier generations addressed the [same] societal problem, but did so through materially different means."[209]

D.C. suggests that machine guns were in common use by mobsters and outlaws in 1934.[210] That could hardly matter less.[211] What matters is whether they were in common use "*for*

---

[209] *Id.* at 2131; *cf. Garland v. Cargill*, No. 22-976, 602 U.S. __, slip op. at 1 (June 14, 2024) (federal ban on machine guns does not cover bump stocks, even though bump stocks enable a semiautomatic gun to approach a rate of fire similar to a machine gun).

[210] *See* Majority Op. at 22-23 (quoting then-Attorney General Cummings's estimate of "at least 500,000" criminals "who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character," National Firearms Act: Hearing(s) on H.R. 9066 Before the Comm. on Ways and Means, 73rd Cong. 45 (1934) (cleaned up)).

For two reasons, Cummings' testimony is not best understood to suggest (let alone prove) that 500,000 law-abiding citizens possessed machine guns and sawed-off shotguns. First, he was talking about criminals. Second, "weapons of the most deadly character" could be anything from a switch blade to a Tommy gun. As for the latter, only 15,000 commercially available Tommy guns were produced; a hefty price tag led to a "lack of demand" and "few sales." Bruce N. Canfield, *The G.I. Thompson in World War II*, Am. Rifleman (Feb. 20, 2019), https://perma.cc/UN9S-3UZE. So "the bulk of the 15,000 . . . Thompson submachine guns languished in the warehouse with only a relatively small number trickling out periodically." *Id.*; *see also Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("The Thompson machine gun (commonly known as the 'Tommy gun') entered commercial sale in the United States in the mid-1920s but saw *very limited civilian use* outside of organized crime and law enforcement." (emphasis added)).

[211] *Friedman I*, 784 F.3d at 416 (Manion, J., dissenting) ("it matters not whether fifty or five thousand mob enforcers used a particular weapon, the question is whether a critical mass of law-abiding citizens did").

*lawful purposes.*"[212] D.C. has not shown that fully automatic machine guns were ever in common use by law-abiding citizens, and I do not understand the majority to argue otherwise.

In addition, although the Supreme Court has said Congress could ban machine guns without violating the Second Amendment, Congress did not actually do so in the 1934 Act.[213] Instead, the Act merely imposed a registration requirement, restricted transfers, and imposed special taxes.[214] Then, about five decades later, Congress prohibited the possession of machine guns made after 1986, while still grandfathering in the possession and transfer of machine guns made before then.[215] So unlike D.C.'s magazine ban, the less burdensome 1934 Act was not even a complete ban on a category of arms.

\* \* \*

Finally, a word on the majority's "nuanced approach" to "unprecedented societal concerns or dramatic technological changes."[216] The phrase comes from dicta in *Bruen* — a decision that did not involve "unprecedented societal concerns or dramatic technological changes" and did not apply the

---

[212] *Heller,* 554 U.S. at 624 (emphasis added); *McDonald*, 561 U.S. at 780 (plurality) (emphasis added).

[213] *See* National Firearms Act, §§ 2, 3(a), 4, 5(a), (6), 10, 11, 48 Stat. at 1237-38.

[214] *Id.*; *see also id.* § 8(a) (requiring identification marks on restricted firearms); *id.* § 9 (recordkeeping requirement for transfers).

[215] *See supra* Part II.B.1; 18 U.S.C. § 922(*o*)(1) (making it "unlawful for any person to transfer or possess a machinegun"); *id.* § 922(*o*)(2)(B) (grandfather provision).

[216] Majority Op. at 26 (cleaned up); *see id.* at 25-30.

"nuanced approach."[217] *Heller*, *McDonald*, and *Rahimi* didn't apply it either.

This single stray line of dicta from *Bruen* is the foundation of the majority's analysis — a slender reed compared to a *holding* of *Heller* that the government cannot ban arms in common use for lawful purposes, especially when *Heller*'s distinction between common and uncommon arms was reaffirmed again (*McDonald*) and again (*Bruen*) and again (*Rahimi*). But even if "unprecedented societal concerns or dramatic technological changes" can justify some limited regulation of common arms, a law "may not be compatible with the right if it [regulates] to an extent beyond what was done at the founding."[218]

Here, D.C. has not named a single Founding-Era law that bans an arm in common use for lawful purposes. (The majority does not say otherwise.) Nor has D.C. named a single such law from the first hundred years of the nation's independence. (Again, the majority does not say otherwise.) And even to the extent that later laws can be relevant, D.C. has identified no "well-established and representative historical analogue" that imposed a "burden" comparable to D.C.'s outright ban on an arm in common use for lawful purposes.[219]

---

[217] *Bruen*, 142 S. Ct. at 2132.

[218] *Rahimi*, slip op. at 7; *see also id.* at 2 (Gorsuch, J., concurring) (regardless of an analogue's justification, "the government must establish that, in at least some of its applications, the challenged law 'imposes a comparable burden on the right of armed self-defense' to that imposed by a historically recognized regulation" (quoting *Bruen*, 142 S. Ct. at 2133) (cleaned up)).

[219] *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).

## V. Conclusion

Mark Twain once told a story about an evening at church. He said that at first the sermon was so inspiring that he planned to put $400 into the collection plate: "I wanted to give that and borrow more to give."[220]  But then his opinion of the sermon tapered off: "My enthusiasm went down, down, down — $100 at a time, till finally when the plate came round I stole 10 cents out of it."[221]

I agree with most of what the majority says in the first 18 pages of its clear, concise, and eloquent opinion.[222]  I agree that plus-ten magazines are likely "'Arms' within the meaning of the Second Amendment,"[223] "in common use" for the lawful purpose of "self-defense,"[224] and covered by "the Second Amendment's plain text."[225]  And I agree that a ban on plus-ten magazines is not analogous to regulations about the storage of gunpowder; or to restrictions on the time, place, and manner of carrying arms; or to state laws from the Prohibition Era directed at machine guns.[226]

But then I part ways with the majority in two respects.

---

[220] *See* "Mark Twain Says Women Should Vote," *New York Times*, p.5 (Jan. 21, 1901).

[221] *Id.*

[222] I don't mean to suggest that Twain's experience is perfectly analogous to mine.  It's no "dead ringer" or "historical twin." *Bruen*, 142 S. Ct. at 2133 (emphasis omitted).

[223] *See* Majority Op. at 9 (quoting U.S. Const. amend II).

[224] *Id.* at 11.

[225] *Id.* (cleaned up).

[226] *See id.* at 15-18.

52

First, the majority reads *Heller* to leave open the question of whether the government can ever ban an arm in common use for lawful purposes.[227]  In contrast, I read *Heller* to answer that question.  It held that "a complete prohibition of their use is invalid."[228]

Second, even assuming that the validity of those bans is an open question, the majority gets the answer wrong.  D.C. has failed to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation."[229]

The majority's contrary conclusion depends on two types of regulations.[230]  But neither of them is analogous.  The first of them — a "handful" of laws enacted nearly a century after the Second Amendment's ratification in two outlier states and a territory — did not cover arms kept at home or carried while traveling; in addition, those laws are too little and too late to establish a historical tradition.[231]  As for the second purported analogue, it covered only "unusual" arms — not arms in common use for lawful purposes.[232]  So neither demonstrates a tradition of laws imposing a burden comparable to D.C.'s complete ban on commonly possessed plus-ten magazines.

Because D.C.'s law violates the right to keep and bear arms guaranteed by the Second Amendment, I would reverse

---

[227] *See* Majority Op. at 12 (concluding that "*Bruen* . . . precludes th[e] argument" that *Heller* prohibits bans on arms in common use for lawful purposes, full stop).

[228] *Heller,* 554 U.S. at 629; *see also supra* Part II.B.3.

[229] *Bruen*, 142 S. Ct. at 2126.

[230] *See* Majority Op. at 19-25.

[231] *See id.* at 19-20.

[232] *See id.* at 22-24.

the district court's decision and direct it to enter a permanent injunction.[233]

I respectfully dissent.

---

[233] If "our holding at this stage" — review of a denial or grant of a preliminary injunction — "makes a certain outcome inevitable . . . , we have the power to dispose of it as may be just under the circumstances, and should do so to obviate further and entirely unnecessary proceedings below." *Wrenn*, 864 F.3d at 667 (cleaned up). Like the D.C. gun law in *Wrenn*, D.C.'s ban "merits invalidation under *Heller,*" so it would "wast[e] judicial resources" to "remand[] for the court to develop the record." *Id.* (citing *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) (reversing denials of preliminary injunctions and remanding with instructions to enter declarations of unconstitutionality and permanent injunctions)).